# NO. 21-4447

In The

# United States Court Of Appeals
## For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

## JONATHAN LYNN JENKINS,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
AT RALIEGH**

—————————

**BRIEF OF APPELLANT**

—————————

Joseph B. Gilbert
TARLTON LAW PLLC
P. O. Box 91624
Raleigh, NC 27675
(919) 630-0286

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES .................................................................................. iii

STATEMENT OF JURISDICTION ...................................................................... 1

ISSUES PRESENTED FOR REVIEW ................................................................. 1

STATEMENT OF THE CASE ............................................................................... 2

    Procedural History ............................................................................................. 2

    Introduction ......................................................................................................... 3

    Relevant Factual Background ........................................................................... 4

SUMMARY OF ARGUMENT ............................................................................. 18

ARGUMENT ............................................................................................................ 20

    I.     THE DISTRICT COURT DENIED APPELLANT A FAIR
            TRIAL BY ADMITTING A TWO-HOUR VIDEO
            RECORDING OF THE STATEMENT MADE BY
            JENKINS TO A LAW ENFORCEMENT OFFICER AND A
            PROSECUTING ATTORNEY IN VIOLATION OF HIS
            RIGHTS TO DUE PROCESS AND FEDERAL RULE OF
            EVIDENCE 410 .................................................................................. 20

            A.     Standards of Review ............................................................. 20

            B.     Relevant law and application to this case ......................... 21

                  i.     The district court violated Rules 410 and 11(f) ........ 22

                  ii.    The district court's error was not harmless ............. 38

II.     THE DISTRICT COURT SHOULD NOT HAVE
        ALLOWED A PEDIATRICIAN WITH NO KNOWLEDGE
        ABOUT THE CASE AND WHO NEVER MET ANY
        ALLEGED VICTIM WITNESSES, TO NEEDLESSLY
        TESTIFY AS AN EXPERT, RESULTING IN JURY
        CONFUSION ABOUT THEIR RESPONSIBILITY TO
        WEIGH AND DETERMINE WITNESS CREDIBILITY ..............41

        A.      Standard of Review..................................................41

        B.      Specific Facts and Relevant Law..........................42

III.    THE DISTRICT COURT IMPOSED AN
        UNREASONABLE SENTENCE......................................53

        A.      Standard of Review..................................................53

        B.      Relevant Law ..........................................................53

        C.      The sentence was procedurally unreasonable...................54

        D.      The sentence was substantively unreasonable.................58

CONCLUSION ........................................................................63

REQUEST FOR ORAL ARGUMENT..................................64

CERTIFICATE OF COMPLIANCE ....................................65

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Arizona v. Fulminante,*
    499 U.S. 279 (1991) ...................................................................41

*Gall v. United States,*
    552 U.S. 38 (2007) ................................................................53, 54

*Kotteakos v. United States,*
    328 U.S. 750 (1946) ...................................................................40

*Miranda v. Arizona,*
    384 U.S. 436 (1966) ................................................................34, 35

*Moran v. Burbine,*
    475 U.S. 412 (1986) ...................................................................37

*North Carolina v. Alford,*
    400 U.S. 25 (1970) .......................................................................3

*Rehaif v. United States,*
    139 S. Ct. 2191 (2019) .................................................................4

*United States v. Abu Ali,*
    528 F.3d 210 (4th Cir. 2008)......................................................40

*United States v. Antoine Wallace,*
    5:18-cr-451-D-2, DE 251-52) (E.D.N.C. Sept. 8, 2021)............59

*United States v. Baker,*
    539 Fed. App'x 299 (4th Cir. 2013) (No. 12-5025)...................60

*United States v. Blake,*
571 F.3d 331 (4th Cir. 2009)....................................................21

*United States v. Blue,*
877 F.3d 513 (4th Cir. 2017)...................................54, 56, 57, 58

*United States v. Burch,*
156 F.3d 1315 (D.C. Cir. 1998) ................................................26

*United States v. Escobedo,*
757 F.3d 229 (5th Cir. 2014)....................................................28

*United States v. Friend,*
2 F.4th 369 (4th Cir. 2021) .....................................................60

*United States v. Garcia,*
752 F.3d 382 (4th Cir. 2014)....................................................41

*United States v. Giddins,*
858 F.3d 870 (4th Cir. 2017)....................................................41

*United States v. Green,*
436 F.3d 449 (4th Cir. 2006)....................................................63

*United States v. Howard,*
773 F.3d 519 (4th Cir. 2014)...................................58, 59, 61, 62

*United States v. Killen,*
729 Fed. App'x 703 (11th Cir. 2018) (No. 15-15001) .............61

*United States v. Knight,*
867 F.2d 1285 (1989) .........................................................33, 34

*United States v. Kweis,*
971 F.3d 453 (4th Cir. 2020)....................................................40

*United States v. Leon-Delfis,*
203 F.3d 103 (1st Cir. 2000) ................................................................. 38-39

*United States v. Little,*
Nos. 92-6719, 92-6720, and 92-6721,
1993 WL 501570 (6th Cir. Dec. 6, 1993) ................................................. 33, 34

*United States v. Manning,*
23 F.3d 570 (1st Cir. 1994) ......................................................................... 39

*United States v. Mezzanatto,*
513 U.S. 196 (1995) ............................................................................... *passim*

*United States v. Nance,*
957 F.3d 204 (4th Cir. 2020) ................................................................... 53, 54

*United States v. Newbert,*
504 F.3d 180 (1st Cir. 2007) ......................................................................... 27

*United States v. Pratt,*
915 F.3d 266 (4th Cir. 2019) ........................................................................ 20

*United States v. Robertson,*
582 F.2d 1356 (5th Cir. 1978) ........................................................ 22, 23, 32, 36

*United States v. Robinson,*
744 F.3d 293 (4th Cir. 2014) ........................................................................ 36

*United States v. Shannon,*
803 F.3d 778 (6th Cir. 2015) ........................................................................ 27

*United States v. Tucker,*
473 F.3d 556 (4th Cir. 2007) ........................................................................ 63

*United States v. Weaver,*
282 F.3d 302 (4th Cir. 2002) ........................................................................ 21

*United States v. Webb,*
965 F.3d 262 (4th Cir. 2020)........................................................62

*United States v. Young,*
223 F.3d 905 (8th Cir. 2000)..................................................21, 27

*Wood v. Milyard,*
566 U.S. 463 (2012) ....................................................................36

**Statutes:**

18 U.S.C. § 2........................................................................................1

18 U.S.C. § 922(g)(1) .........................................................................1

18 U.S.C. § 1591(a) ............................................................................1

18 U.S.C. § 1591(b)(2) .......................................................................1

18 U.S.C. § 1594(c) ............................................................................1

18 U.S.C. § 1952(a)(3) ........................................................................1

18 U.S.C. § 3231 .................................................................................1

18 U.S.C. § 3553 ...............................................................................56

18 U.S.C. § 3553(a) ....................................................................*passim*

18 U.S.C. § 3553(a)(6) ......................................................................59

18 U.S.C. § 3742(a) ............................................................................1

28 U.S.C. § 1291 .................................................................................1

**Constitutional Provisions:**

U.S. Const. amend VI........................................................................35

**Rules:**

Fed. R. Crim. P. 11(e)(6)................................................21, 22, 24, 26

Fed. R. Crim. P. 11(f)...............................................................*passim*

Fed. R. Crim. P. 29 ....................................................................17

Fed. R. Evid. 401 ......................................................................43

Fed. R. Evid. 402 ......................................................................43

Fed. R. Evid. 403 ..............................................................*passim*

Fed. R. Evid. 410 ..............................................................*passim*

Fed. R. Evid. 410(a)(4)................................................................32

Fed. R. Evid. 702 ................................................................42, 43

Fed. R. Evid. 704 ......................................................................42

Fed. R. Evid. 704(b) ...................................................................42

**Other Authorities:**

U.S.S.C. Sourcebook of Federal Sentencing Statistics, Fiscal Year 2021, Table 15, available at: https://www.ussc.gov/sites/default/files/pdf/ research-and- publications/annual-reports-and-sourcebooks/ 2021/Table15.pdf (last visited Oct. 10, 2022) ....................................................60

## STATEMENT OF JURISDICTION

The district court had jurisdiction over the criminal prosecution pursuant to 18 U.S.C. § 3231 for offenses alleged under 18 U.S.C. § 1594(c) (conspiracy to commit sex trafficking), 18 U.S.C. §§ 1591(a) and (b)(2) (sex trafficking), 18 U.S.C. § 1952(a)(3) (using the internet to promote an illegal business enterprise), 18 U.S.C. § 922(g)(1) (felon in possession of a firearm) and 18 U.S.C. § 2 (aiding and abetting). This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). Appellant filed a timely notice of appeal on August 25, 2021. This appeal is from a final order.

## ISSUES PRESENTED FOR REVIEW

I.    Whether the district court denied Appellant a fair trial by admitting a two-hour video recording of Jenkins' statement to a prosecuting attorney during plea negotiations.

II.   Whether the district court failed to exercise its gatekeeping responsibilities under Rule 403 during expert testimony.

III.  Whether the district court imposed an unreasonable sentence.

# STATEMENT OF THE CASE

## *Procedural History*

A federal grand jury in the Eastern District of North Carolina charged Jenkins in a superseding indictment with five crimes resulting from his activities with his nephew while they ran a prostitution scheme between November 2014 to October 20, 2015. (JA29-34) The indictment alleged conspiracy to commit sex trafficking, sex trafficking, using the internet to promote prostitution, and firearm possession by a felon. Jenkins pleaded not guilty and a five-day jury trial resulted in conviction on the five counts. (JA14-15)

On August 4, 2021, the district court sentenced Jenkins to three consecutive life sentences for the conspiracy and sex trafficking charges, 60 months for the internet charge (concurrent with the three life sentences) and 120 months for the felon in possession charge (concurrent with the 60-month sentence. The court also imposed 5 years of supervised release for the first three counts and 3 years each on counts four and five, all to run concurrently, a $500 special assessment and restitution. (JA18) The court

entered an amended judgment on August 11, 2022 and Jenkins timely

noted his appeal thirteen days later. (JA18)

*Introduction*

Jonathan Jenkins was raised in North Carolina and attended Western

Carolina University on a football scholarship.  Before he completed his

college education, the Miami Dolphins National Football League team gave

him a tryout.  Jenkins later entered a no contest plea to second degree

murder pursuant to *North Carolina v. Alford,* 400 U.S. 25 (1970).

Upon release from state prison, Jenkins briefly worked for his sister

in a group home she operated until the business failed. (JA788)  Later,

while living with Wallace (during 2015) Jenkins worked mornings doing

electrical work.

Wallace operated a prostitution business in North Carolina, offering

a place to stay and all other essential needs for women down on their luck.

Sometime later, Jenkins joined Wallace's scheme.  One of the women who

testified stated that Jenkins "would do anything that (Wallace) told him to

do." (JA332)  The scheme's "business model" would offer commercial sex

with women between the ages of 18 – 21 years old.  The scheme used Backpage internet ads, with telephone numbers for customers to call. Wallace provided each woman a cell phone so they could arrange their meetings with customers. (JA424)

The scheme lasted less than one year and never produced much income. Wallace and Jenkins did not realize the prostitutes were declining or blocking customer calls when the women did not want to engage in commercial sexual services.  (JA468, JA747)

The Johnston County Sheriff's Office obtained and executed a search warrant on Wallace's house three months after the prostitution ring ceased operations and arrested Wallace and Jenkins the same date.

### *Relevant Factual Background*

The government obtained an indictment alleging five counts against Wallace and Jenkins. (JA22)  A year later, the government obtained a superseding indictment. [1] (JA29)

---

[1]  The superseding indictment reproduced the original but used a different font, resulting in one fewer page and included language in count five to comply with *Rehaif v. United States*, 139 S. Ct. 2191 (2019).

Wallace later decided to plead guilty to a single count of sex trafficking and agreed to testify for the government.

Prior to trial, Jenkins filed two motions to limit the government's evidence. Jenkins moved to suppress a two-hour recorded interview between Jenkins and an assistant district attorney (ADA) because it was made during plea negotiations. (JA35) After the Government opposed, (JA53) the District Court denied the motion in a written order. (JA80) Jenkins also sought to bar the government from calling a pediatrician, as an expert witness to "educate the jury generally about sex trafficking." (JA101) The government opposed this motion. (JA108) The district court orally denied Jenkins' motion the day the trial began. (JA120-121)

At trial, the government called fourteen witnesses. Six law enforcement officers, four women who had worked as prostitutes and one customer were among those who testified. Wallace, and Dr. Sharon Cooper also testified.

Robert Pereira testified first for the government. Although the Johnston County Sheriff's Office charged state crimes during 2016, Pereira

became involved late in 2018. (JA-179) A senior detective with the Raleigh

Police Department, he and his unit conducted the investigation into

Wallace and Jenkins involving Princess and Miracle.[2] (JA152).  Pereira also

provided foundation evidence for admitting documents and photographs,

including photographs of other women, Goldie and Dutchess. (JA154-158).

Donald Pate, a Johnston County Sheriff Office Lieutenant supervised

the search of Wallace's house on the date they arrested Wallace and

Jenkins. (JA226).

Pate first became involved in the investigation in October 2015, when

he attempted to interview Princess.  (JA279).  The office obtained a warrant

to track Wallace's vehicle. (JA280-281). Pate also initiated state charges

against Wallace and Jenkins. (JA295-296).

On the day after Jenkins arrest, Pate and ADA Kelly Sandling met

with Jenkins, at his request, as part of plea negotiations on the state

---

[2] All witnesses were adults at the time of trial.  Witness testimony
sometimes referred to the women by their actual names, other times by
various nicknames.  To avoid confusion, Appellant will identify the women
by one of their nicknames throughout this brief.

charges. (JA274) The government entered the resulting audio and video recording as government exhibit 32 to close their case. (JA274-277)

Princess testified and said that she worked as a prostitute for Jenkins. (JA314) She was raised by an unemployed foster mother who adopted nine children and used their disability checks for support. (JA315) Princess said her disabilities included ADHD, ODD and mental learning disability.[3] She stated that as a teenager she ran away from home because her mother was drunk and belligerent, told the children she "only wanted them for the checks" and she did not feel wanted or comfortable at home. (JA316). She and her siblings, who also suffered unstated disabilities, would steal food and cook it in abandoned houses. (JA316) She joined the "Bloods" gang at age 15. (JA316) After trouble with law enforcement in South Carolina, Princess was treated at a psychiatric residential and therapeutic care facility in North Carolina, until her mother wanted her placed with an aunt, so her mother could "still receive my disability checks." (JA317-320)

---

[3] ADHD refers to attention deficit hyperactivity disorder and ODD is oppositional defiant disorder.

She ran away from her aunt's home because "they were alcoholics, and I was just tired of being degraded." (JA320)

Princess testified that she had never worked as a prostitute before she went to stay with Wallace (JA325)  However, Wallace later testified that Princess was working as a prostitute for "Sosa" before she came with Goldie (another prostitute) to work for Wallace. (JA711)

Before Princess moved in with Wallace, she resided in Smithfield, North Carolina with another gang member named "Sosa" and a prostitute, Goldie. (JA322-323)  While she and Goldie were residing at a Motel 6 in Kenly, she met Wallace. (JA323)    Princess said that she recruited other girls to work, and the target range was between 18 and 21 years old. (JA374)

Princess said that Wallace would tell Jenkins what to do and that during 2015 Jenkins worked as an electrician in the mornings from 8:00 until noon. (JA420-421)  While Princess and Jazz worked for the organization, Princess attended classes to obtain her GED and Jazz studied cosmetology at Johnston County Community College. (JA436)  Princess

had a Facebook account since 2008 and used it frequently to communicate with her friends, including Miracle after Miracle left the scheme and later when Miracle returned in 2015 before she quit again. (JA425)

Whenever Princess visited health care providers in 2015, she never reported any beatings or sexual assaults. (JA445). When Princess talked to Detective Hubbell, she told the detective that Wallace had beaten her but failed to provide any photos Hubbell requested to document the alleged injuries. Princess said they were not serious injuries and required no medical treatment. Princess helped Wallace and Jenkins to post advertisements on Backpage. (JA433) Princess started seeing Wallace again after she left the scheme. (JA437)

Princess claimed she met Jenkins the same day he was released from prison and two days after she met Wallace. (JA440). However, Jenkins was released from prison January 2, 2014, some ten months before the date the grand jury found the prostitution scheme began. (JA1464, JA29).

Princess went on a vacation with her customer Al to Virginia Beach during September or October 2015. (JA444).

Miracle next testified for the government. She had a prior felony conviction for assault with a deadly weapon intent to kill inflicting serious injury. (JA511) Miracle wore prison garb to court because she had violated probation. She had been a member of the Bloods gang. She testified that Wallace and Jenkins provided firearms to some of the girls so they could protect themselves. (JA485-486) She wanted to leave because Jenkins "cussed her out," so Jenkins drove Miracle to her mother's house on February 8, 2015. (JA498-500)

Miracle returned a few months later and met two new girls, Jazz, and Dutchess. (JA500, JA503) Miracle had stayed with her child's father in Louisburg until they had a falling out, so she called Princess, who came with Wallace to give her a ride back to the group. (JA505)

Miracle left again after two weeks and stayed at a women's shelter for about four months. (JA505, JA509) The shelter had a program called FIGHT, not available to prostitutes but to those who explained that they were victims of sex trafficking. (JA510) The program provided her transportation to OB/GYN appointments. (JA510)

Miracle had several interviews with law enforcement officers approximately a month before the trial. During an interview three days before the trial began, she admitted that she had told Wallace and Jenkins that she was 21 years old. (JA524)

Jazz testified after Miracle. She knew Wallace during her childhood. She was 19 years old in early 2015 and had been working as a prostitute, advertising by word of mouth. (JA533) Jazz ran into Wallace and told him about her situation so he offered to help. (JA534)  Some weeks later Jazz called Wallace for help, and he offered her stability and a "roof over her head" so she went to live with him. (JA535)

Jazz said Jenkins comforted her because she had suffered anxiety and panic attacks since she was young.  He also bought her clothing, food and hygiene products. (JA538)  She said she never saw Wallace or Jenkins with firearms. (JA574)  When she arrived to live with Wallace she was addicted to cocaine. (JA617).  Jenkins helped her to get through drug withdrawal.(JA618)  After she successfully ceased cocaine use, she attended Johnston County Community College daily, studying

cosmetology. (JA619-620)  Jenkins drove her to classes and she received financial aid, to pay for the courses.  She gave the rest of the money to Wallace and Jenkins for living expenses. (JA620)  At the time Jazz was attending community college, Jenkins was getting his electrician's license. (JA628)  Jazz would text Jenkins to see how he was doing with his electrical work, and he shared his experiences via text messages, such as receiving electrical shocks. (JA625)

Jazz also studied to obtain her driver's license, and Jenkins helped her with that.  She obtained her driver's license but could not recall if it was after Jenkins and Wallace were arrested. (JA629)  While she was living with them, Wallace and Jenkins provided her housing, decent food, clothing, and pretty much everything she wanted. (JA635-636).

Dutchess was the fourth and final witness to testify about her work for Wallace and Jenkins. During the Spring of 2015 she was 18 years old. (JA651)  She said that Jenkins was the head of security and made sure nothing went wrong when clients came to meet her. (JA668)  She stayed there about six weeks. (JA673)  When she decided she did not want to take

client calls, she would block them or hang up on them. (JA680).   Duchess

said that when she left, Wallace dropped her off at a bus station without

money, so she called her aunt to get a ride home. (JA682-683)  She used her

cell phone to call her aunt on the same phone she had brought with her

when she joined the organization. (JA685)  On cross-examination, when

asked if she ever became sick or ill, she could not remember, but did recall

going to the hospital and Jenkins saw to her needs when she was released.

(JA686-687)

Wallace testified for the government as part of his cooperation

agreement with the government.  He had pleaded guilty to one count of

sex trafficking.

Wallace had earlier pleaded guilty to related charges, possession with

intent to deliver marijuana and possession of a stolen firearm. (JA705)

During the timeframe encompassing this case, he said he was a member of

a gang known as the 9-Trey Gangsters, a subset of the United Blood Nation

(UBN). (JA705-706)

The first two women he managed as prostitutes were Goldie and Princess. (JA707) He met Goldie in 2014, through her baby's father Mike, with whom he sold marijuana.  Mike went to prison and Wallace gave Goldie some money and got her a room, where she "did her own thing from there, for whatever she did for whatever reasons." (JA708-709)  He knew she was selling her own body  to support herself. (JA709)  Wallace offered to help her. (JA709)

Wallace had seen Princess in Smithfield with another gang member he referred to as Sosa, and he met her at a truck stop in Kenly. (JA709-710) Goldie called him and said they were making money and staying at a nearby hotel, so Wallace decided "I'm going to ride over there and see what they got going on." (JA710)

Goldie and Princess were working as prostitutes for Sosa until Wallace confronted Sosa and took them as his own. (JA711)  Princess showed Wallace "how Backpage worked." (JA789)

Wallace said it was his idea to have Jenkins join his organization as his guard and assistant pimp. (JA713)   Wallace kept the money the

women earned. (JA718)  The women would write a list of things they

needed, and he would give them the money, go to the store with them and

they would buy the items. (JA718)  Wallace also took them shopping for

clothes. (JA719)

Wallace rented the house (ultimately searched) where he lived with

his girlfriend and children. (JA719)  Initially Wallace had the women take

"in calls" for customers at hotels in Smithfield or Fuquay Varina (JA721-

722)  Later Wallace had his girlfriend rent an apartment in Four Oaks for

the women to live and operate the business. (JA723)

Wallace said Miracle stayed less than a month, then left because "we

were taking too long to bring food." She returned later and he said she left

after about one week. (JA744-745)

Wallace named Al as Princess' regular client. (JA774) Wallace also

said that Princess left sometime between  October 19th and 20th of 2015.

(JA776-777)

Wallace maintained a relationship with Princess after she left the

organization. (JA782)  On the day Wallace's house was searched, he had

loaned his Lexus vehicle to Jenkins so he could drive Jazz to school on Jenkins' way to work. (JA783)

Wallace said Princess went to Virginia several times without Wallace or Jenkins. (JA792-793)  After Princess left the organization, she moved to an apartment in Raleigh where Wallace would visit her. (JA794)

Albert Abdelnor (Al) testified after Wallace.  Al worked at Ruby Tuesdays and would sometimes see Jenkins and Princess come to the restaurant to get something to eat or to pick up food. (JA824) Al met Princess via Backpage during 2015 and he met her for sex at a Smithfield hotel. (JA817) After that he saw her about four times each week, then his contact with her progressed to almost daily.  (JA818)

 Al would take Princess on errands or to get her hair or fingernails done. (JA818)  He said he took Princess on a three- or four-day vacation to Virginia Beach. (JA818)

Al thought Jenkins was Princess' brother. (JA823). Sometime around October 2015, at her request, Al picked up Princess at the Four Oaks apartment and helped her move to Rocky Mount. (JA826-277)  Al said

Princess did not seem afraid the day he helped her move out. (JA827) Al described her as always "pretty calm" and "never seemed to get upset about stuff." (JA827) About six hours later, in the evening, Jenkins called and asked if he had seen his sister. Jenkins called back again and said someone saw her with you earlier, but Jenkins did not seem upset to Al. (JA828)

Dr. Cooper was the government's final witness. Her testimony relevant to this appeal is contained in argument II, below.

The final evidence the jury saw during the government's case was Government Exhibit 32, a two-hour video/audio recording from Jenkins' meeting with Detective Pate and the ADA about the prostitution operation. The government then rested its case. (JA994)

The defense moved to dismiss the charges pursuant to Fed. R. Crim. Proc. 29 (Rule 29 motion), which the district court denied. (JA1001).

Jenkins called their investigator and four law enforcement witnesses who had interviewed the women and elicited prior inconsistent statements. (JA1004-1050).

On August 4, 2021, the district court conducted Jenkins' sentencing hearing. (JA1367-1406).

The arguments below contain additional facts specific to each argument.

## SUMMARY OF ARGUMENT

Jenkins moved to suppress a video confession obtained in violation of his rights under due process, Federal Rule of Evidence 410, and Federal Rule of Criminal Procedure 11(f). Jenkins statements were made when he subjectively believed he was conducting plea negotiations with the prosecutor who interrogated him with a detective. Jenkins did not know of or waive his Rule 410 protections.

The recorded confession became a two-hour video, played at the end of the government's case in chief. The government relied heavily upon the confession during opening statement and both closing arguments.

The improper confession was highly probative and no doubt the center of the jury's attention. There is a reasonable probability that the improper confession contributed to the verdicts against Jenkins.

Moreover, the district court twisted the facts and law to admit the confession, effectively repealing Rule 410 and endangering the policy behind the rule, that is, one favoring plea negotiations.

The remedy for this error is to vacate the convictions and remand for a new trial.

Jenkins moved in limine to suppress general expert testimony about sex traffickers. The district court allowed the testimony by a pediatrician with no knowledge about the facts of this case. The witness expounded at length about horrible aspects and behavior by sex traffickers based on literature and irrelevant to the issues to be resolved by the jury.

The district court allowed unduly prejudicial and irrelevant testimony, which wasted time and confused the jury, to Jenkins' detriment.

The remedy for the Rule 403 error by the district court is to vacate the judgment and remand for a new trial.

The district court imposed three consecutive life sentences for a defendant whose culpability was based largely on his conduct aiding and abetting the person for whom he worked, and who received a sentence of

156 months for essentially the same offense conduct. The consecutive life

sentences were procedurally and substantively unreasonable.

The district court imposed  the sentences after ignoring important

sentencing factors and failed to explain why it rejected Jenkin's substantial

evidence and arguments in extenuation and mitigation.

The remedy for sentencing errors is to vacate the judgement and

remand for a new sentencing hearing.

## ARGUMENT

I.  **THE DISTRICT COURT DENIED APPELLANT A FAIR TRIAL BY ADMITTING A TWO-HOUR VIDEO RECORDING OF THE STATEMENT MADE BY JENKINS TO A LAW ENFORCEMENT OFFICER AND A PROSECUTING ATTORNEY IN VIOLATION OF HIS RIGHTS TO DUE PROCESS AND FEDERAL RULE OF EVIDENCE 410.**

A.  **Standards of Review**

When a district court denies a motion to suppress, this Court reviews

its factual findings for clear error and its legal determinations *de novo*.

*United States v. Pratt*, 915 F.3d 266, 271 (4th Cir. 2019).

In determining whether an accused's statements were made in the

course of plea negotiations so as to trigger the application of

Fed.R.Crim.Proc. 11(e)(6) and Fed.R.Evid. 410 (Rule 410), the appellate

court looks to the specific facts of each case and examines the totality of the

surrounding circumstances. *United States v. Young*, 223 F.3d 905, 909 (8th

Cir. 2000).

This Court reviews evidentiary rulings for abuse of discretion. *United

States v. Blake*, 571 F.3d 331, 350 (4th Cir. 2009).

A district court abuses its discretion when decisions are arbitrary or

irrational. *United States v. Weaver*, 282 F.3d 302, 313 (4th Cir. 2002).

**B.      Relevant law and application to this case**

Rule 410 of the Federal Rules of Evidence prohibits the government

from introducing a statement made by one during plea discussions.  The

relevant portions of Rule 410 are:

**Rule 410 - Pleas, Plea Discussions, and Related Statements**

(a) [Evidence of the following is not admissible against
the defendant who participated in the plea discussions;]

(4) a statement made during plea discussions with an
attorney for the prosecuting authority if the discussions
did not result in a guilty plea or they resulted in a later
withdrawn guilty plea.

Rule 11(f), Rules of Criminal Procedure states:

**(f)** ADMISSIBILITY OR INADMISSIBILITY OF A PLEA, PLEA
DISCUSSIONS, AND RELATED STATEMENTS

The admissibility or inadmissibility of a plea, a plea discussion,
and any related statement is governed by Federal Rule of
Evidence 410.

### i. The district court violated Rules 410 and 11(f)

Counsel is unaware of any published cases from this Court

explaining the approach to determine whether statements made by a

defendant to a prosecuting attorney are "made during plea discussions."

However, a case from the 5th Circuit in 1978 is instructive:

> To determine whether a discussion should be characterized as a
> plea negotiation and as inadmissible, the trial court should
> carefully consider the totality of the circumstances. Thus, each
> case must turn on its own facts. However, the policy
> underlying Fed.R.Crim.P.11(e)(6) and Fed.R.Evid. 410 provides
> the basic orientation toward this characterization. In essence,
> the rule of admissibility is designed to serve both as an
> incentive and as a prophylactic; the rule both encourages and
> protects a free plea dialogue between the accused and the
> government. Given this essential purpose, the trial court's
> initial inquiry must be focused on the accused's perceptions of
> the discussion, in context. *United States v. Robertson*, 582 F.2d
> 1356, 1366 (5th Cir. 1978).

*Robertson* also established a two-part test:

The trial court must apply a two-tiered analysis and determine, first, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused's expectation was reasonable given the totality of the objective circumstances. *Robertson*, 582 F.2d at 1366.

In 1995, the Supreme Court examined the plain text of Rule 410.

*United States v. Mezzanatto*, 513 U.S. 196 (1995).  Mezzanatto (Respondent)

and his attorney met with the prosecutor to discuss the possibility of

cooperating with the government. As a condition to proceeding with the

discussion, the prosecutor required Respondent to agree that any

statements he made during the meeting could be used to impeach

contradictory testimony he might give at trial if the case proceeded that far.

After conferring with counsel, he agreed to the terms and during that

meeting admitted knowingly attempting to sell an undercover officer

methamphetamine. During the same meeting, he also admitted he knew

about a methamphetamine laboratory another suspect (Schuster) operated

from home. However, he claimed he had visited the lab more than a week

prior to his arrest. The prosecutor showed him proof that his car was on

Shuster's property the day before the arrest, terminated the meeting for

failing to provide completely truthful information and the case went to

trial. Respondent took the stand, denied knowing that the package he

delivered to the undercover officer contained methamphetamine, and said

he had thought Shuster used his home laboratory to manufacture plastic

explosives for the CIA. He also denied knowing that the package he

delivered to the undercover officer contained methamphetamine.

Over defense counsel's objection, the prosecutor cross-examined

Respondent about the inconsistent statements he had made during the

meeting with the prosecutor.

The 9th Circuit reversed the conviction, holding that the agreement

allowing admission of his plea statements for impeachment was

unenforceable. The 9th Circuit ruled that allowing one to waive the

protection provided by these rules was contrary to the will of Congress.

The Supreme Court observed that Rules 410 and 11(e)(6) are

substantively identical.[4] *Mezzanatto*, 513 U.S. at 200.  The Court declined to

---

[4]  In 1979, Rule 11(e)(6) was replaced by Rule 11(f) to avoid confusion, and
it now simply provides that courts should follow Rule of Evidence 410
regarding suppression of plea statements.

"interpret Congress' silence as an implicit rejection of waivability."

*Mezzanatto*, 513 U.S. at 204.  The Court further stated:

> Because prosecutors have limited resources and must be able to
> answer "sensitive questions about the credibility of the
> testimony" they receive before entering into any sort of
> cooperation agreement … prosecutors may condition
> cooperation discussions on an agreement that the testimony
> provided may be used for impeachment purposes. *Mezzanatto*,
> 513 U.S. at 207 (internal citation omitted).

Three justices concurred but expressed concern about allowing the

use of such statements in the government's case in chief:

> It may be, however, that a waiver to use such statements in the
> case-in-chief would more severely undermine a defendant's
> incentive to negotiate, and thereby inhibit plea bargaining. As
> the Government has not sought such a waiver, we do not here
> explore this question." *Mezzanatto*, 513 U.S. at 211 (Ginsburg,
> O'Connor and Breyer, JJ., concurring).

Two other justices presciently warned of two likely consequences

from allowing waiver for impeachment purposes, as they saw it, in

defiance of the Rules Advisory Committee's intent:

> The first consequence is that the Rules will probably not even
> function as default rules, for there is little chance that they will
> be applied at all. Already, standard forms indicate that many
> federal prosecutors routinely require waiver of Rules 410 and

11(e)(6) rights before a prosecutor is willing to enter into plea discussions….

Plea agreements …. commonly contain a provision stating that proffer information that is disclosed during the course of plea negotiations is . . . admissible for purposes of impeachment ….

The second consequence likely to emerge from today's decision is the practical certainty that the waiver demanded will in time come to function as a waiver of trial itself. It is true that many (if not all) of the waiver forms now employed go only to admissibility for impeachment. But although the erosion of the Rules has begun with this trickle, the majority's reasoning will provide no principled limit to it. The Rules draw no distinction between use of a statement for impeachment and use in the Government's case in chief. If objection can be waived for impeachment use, it can be waived for use as affirmative evidence, and if the Government can effectively demand waiver in the former instance, there is no reason to believe it will not do so just as successfully in the latter. When it does, there is nothing this Court will legitimately be able to do about it. *Mezzanatto*, 513 U.S. at 217 (Souter and Stevens, JJ., dissenting).

The Supreme Court reversed the 9th Circuit because that court had expanded the plain text of the controlling rules.

As predicted, the trickle increased its volume after the Supreme Court's ruling in *Mezzanatto. See United States v. Burch*, 156 F.3d 1315, 1322 (D.C. Cir. 1998) (allowing defendant to waive Rule 410 rights, permitting

statements made in the plea proceeding itself and in a subsequent

debriefing to be used in government's case-in-chief). The D.C. Circuit

reasoned that such an expansion would not undermine the policy favoring

plea negotiations under those facts. *Id*.

As the trickle became a stream, some circuits allowed the government

to use statements when a defendant, with the assistance of counsel

knowingly waived Rule 410 protections in written agreements. *See United*

*States v. Young*, 223 F.3d 905 (8th Cir. 2000) (upheld written waiver

explaining consequences of plea breach, entered with counsel's assistance),

*United States v. Shannon*, 803 F.3d 778 (6th Cir. 2015) (affirming introduction

of *Kastigar* letter containing provision agreeing that prosecutor could rebut

evidence inconsistent with statements made during plea discussions).

However, other circuit decisions supported the policy encouraging

the plea-bargaining process expressly provided by Rule 410. *See United*

*States v. Newbert*, 504 F.3d 180 (1st Cir. 2007) (affirming trial court's ruling

that government not entitled to admit statements by applying ambiguous

waiver language from plea agreement after court allowed defendant to

withdraw guilty plea based on newly discovered evidence of innocence). *United States v. Escobedo*, 757 F.3d 229 (5th Cir. 2014) reversed the conviction obtained after the district court permitted the government to introduce the factual basis of Escobedo's withdrawn plea agreement and the statements he made when he entered a guilty plea, but then withdrew it.

Escobedo took the stand and stated that he did not wish to plead guilty because he was not guilty. The government also used the transcript from the plea colloquy to cross-examine the defendant. *Escobedo*, 757 F.2d at 232. The 5th Circuit reversed the conviction because Escobedo did not breach the plea agreement by withdrawing his guilty plea before the court accepted the plea, as he was entitled to do.

Jenkins entered plea discussions with the prosecutor, trying to benefit himself and Wallace, his nephew.  The prosecutor failed to reduce any agreement to writing and never mentioned or demanded that Jenkins waive his Rule 410 rights. All this took place during a three hour interview the day after Jenkins and Wallace were arrested.  Jenkins was not only concerned about the offenses for which he had been arrested, but also

possible federal charges and a potential death penalty in a cold murder case for which he had been previously interviewed.

After the meeting concluded, Wallace entered a guilty plea to possession with intent to deliver marijuana and possession of a stolen firearm and received probation. The state later indicted both Jenkins and Wallace for human trafficking and in 2018, the federal government indicted both men for the charges that led to Jenkins' jury trial.

Prior to trial, Jenkins filed a motion in limine, citing Rules 410 and 11(f) as well as due process. Jenkins sought to exclude the two-hour movie of the confession produced from the interview conducted while Jenkins engaged in the plea discussions with the prosecutor. (JA35-52). The government responded in opposition, arguing that Rule 410 should be construed narrowly and that the Rule does not exclude statements made after a plea agreement has been reached. (JA53-79). The district court essentially adopted the government's position raised in opposition, parsing a "plea agreement" from Jenkins' initial statements and the prosecutor's

statement that it would allow Wallace to enter a plea to some charges for a

probationary sentence.  JA80-100)

In its written order denying the Rule 410 motion, the district court

cited the following exchange between the prosecutor and Jenkins:

> MS. SANDLING: Jonathan, I spoke with my boss, Susan Doyle, she's the District Attorney for Johnston County and I went over with her what you said that-and correct me if I'm wrong, but earlier when we were talking you said you wanted that to take most of the charges in exchange for providing information on our cases, the sex cases, human trafficking case you're charged with and the firearm by felon that in exchange for giving Antoine Wallace some consideration.
>
> MR. JENKINS: What does that mean giving consideration?
>
> MS. SANDLING: Meaning I would not be proceeding on the sex charges. I can't say that I'm going to dismiss everything, okay?
>
> MR. JENKINS: That's fine.
>
> MS. SANDLING: You said he could fight the gun charge, the stolen firearm, and the weed charge?
>
> MR. JENKINS: Give a chance to go home. I need him to go home.
>
> MS. SANDLING: And essentially I would be proceeding with the felony but would be offering him probation.

MR. JENKINS: Let's talk then.

MS. SANDLING: Okay. (JA83)

The district court's order cited some facts from the interview and characterized them as "the parties again reviewed the pleas terms."

> Detective Pate and Sandling reminded Jenkins that Wallace would have to agree to the plea offer made to him… Jenkins again repeated his refusal to plead to charges involving a minor… Jenkins sought a clarification. He asked, "Are there going to be other charges from my statements?" Sandling replied, "Well, if other people are involved possibly, yes." Jenkins responded, "This is it then." … Jenkins responded that he objected to taking a charge involving a minor. Sandling replied, "You're just here to tell us about the organization and what happened." (JA84) (internal citations omitted)

Detective Pate took notes as Jenkins answered the prosecutor's questions about the prostitution activities. At after two hours, he asked Jenkins to verify the accuracy of his notes and that Jenkins sign the notes. (JA275, JA1361) The district court characterized Jenkins' review and signature on Pate's notes as "Jenkins signed the confession." (JA85) The district court's order stated:

> As soon as Jenkins signed the confession Jenkins asked, "So where do we sit on my nephew?" … Sandling … stated, "What I intend to do is ... before [Wallace] may want to take the plea

that I'm going to offer him, I've got to provide the discovery in the case. That's not going to happen overnight . . . . I will made [sic] an offer that will include the weed charge and the stolen firearm charge and offer him probation. Now whether he accepts that is up to him. (JA85)

The district court's order cited the *Robertson* test used to determine

whether a statement is made during plea negotiations:

[T]he court first must assess whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused's expectation was reasonable given the totality of the objective circumstances. *United States v. Robertson*, 582 F.2d 1356, 1366 (5th Cir. 1978) (en banc)). (JA90-91)

The order also observed that:

Statements voluntarily made "after a plea agreement been reached cannot be considered statements made 'in the course of plea discussions' within the meaning of the exclusionary rule." This principle under Rule 410(a)(4) applies when a defendant is debriefed after entering into a written plea agreement with the government. (JA91)

The court added:

This principle under Rule 410(a)(4) also applies to oral plea agreements negotiated with a defendant. (JA91)

The district court cited a published case from the 11th Circuit and an unpublished table case from the 6th Circuit to support the admission of statements after negotiated oral "plea agreements."

> For example, in *Knight*, 867 F.2d at 1287, a federal agent arrested a woman pursuant to a federal warrant and indictment and advised her of her Miranda rights. The federal agent informed her that the U.S. Attorney's Office authorized him to offer her a plea deal to a one-count indictment in exchange for her "truthful cooperation and statement." *Id.* She "accepted the offer and began answering [the agent's] questions." *Id.* The Eleventh Circuit held that her statements were admissible because "[t]he point of plea negotiations had passed once [she] accepted the plea offer." *Id*. at 1288. Similarly, in *United States v. Little*, Nos. 92-6719, 92-6720, and 92-6721, 1993 WL 501570, at *1-2 (6th Cir. Dec. 6, 1993) (per curiam) (unpublished table opinion), a federal agent informed James Townsend that the agent had substantial evidence against him. The agent also told Townsend that if he cooperated immediately, Townsend would not be immediately arrested, his wife would not be charged, and the government would file a cooperation statement, which might reduce his sentence to ten years …. At Townsend's request, an Assistant United States Attorney met with Townsend and confirmed the offer. Townsend accepted the offer. Later that day, after a Miranda warning, Townsend provided a statement to the agent. Townsend stopped cooperating, he was indicted, pleaded not guilty, and his statement was admitted at trial…. In *Little*, the Sixth Circuit held that Townsend's statement to the agent was admissible because Townsend made it "after he had accepted [the] plea agreement offer. At that time, plea discussions had ended and a plea agreement had been formed." (JA92) (internal citations omitted)

The district court misplaced reliance on *Knight* and *Little*. In *Knight* the 11th Circuit relied upon appellant Garrison's statements in her brief that she "had accepted the government's (verbal) offer as she raised the plea discussion objection for the first time. *Little* is an unpublished case and unlike the vague back and forth discussions throughout Jenkins' three-hour interview, the prosecutor made a very specific offer for a ten year maximum sentence in exchange for Thompson's promise to plead guilty when charged. Unclear and vague remarks by both sides throughout the three-hour interview did not amount to any specific "plea agreement" that terminated the plea negotiations.

The district court then stated "Jenkins understood the difference between protected plea negotiations and an admissible confession:

> Jenkins began by asking "is there anyway [sic] I can tell you what I'm looking for out of what I'm going to say before I start because I understand that realized after I finished talking, everything that once I start talking, everything that I said will be held against me in a court of law." (JA93)

Jenkins' "understanding" quoted above merely repeated the *Miranda* warning Detective Pate had just finished reading to him. At no point did

the prosecutor discuss Rule 410 or make a demand that he waive its protections.  The district court simply concluded, after Jenkins had been advised of his *Miranda* and 6th Amendment rights, and parroted back those rights -- anything he said  "can be used in a court of law," that he also "understood the difference between an admissible confession and protected plea negotiations.

The district court then decided that, during the same meeting between Jenkins, Detective Pate and prosecutor Sandling:

> After the parties had reached an agreement, Jenkins unsuccessfully sought to renegotiate the terms. When Jenkins asked to avoid the death penalty, Sandling responded, "Well that's a new addition." Detective Pate then said that they already gotten approval for the deal that Jenkins had requested. Sandling reminded Jenkins that (in the court's words, "under the terms of the deal"), Sandling would not promise how to handle the Whitfield homicide. (JA940)

The district court then characterized the discussion as a decision by Jenkins to "accept Sandling' s refusal to reopen negotiations," adding:

> Jenkins confirmed that he was ready to talk, the deal was "on the table," and the only thing left was for the state to dismiss Wallace's human-trafficking charges and offer probation to Wallace on the marijuana and gun charges. (JA94)

The court then stated that "Sandling agreed." (JA94) The district court decided that Jenkins accepted Sandling's "formal plea offer" by saying, "Let's talk then." (JA96).

The district court also twisted part one of the *Robertson* two-part test (a defendant's subjective understanding that plea discussions are occurring), finding that "The court finds that Jenkins subjectively knew that his confession to human trafficking was not part of one continuous plea negotiations. *See Robertson*, 582 F.2d 1366." (JA97)  Then, instead of making a finding whether Jenkins' subjective understanding (that plea discussions were occurring) was reasonable -- *Robertson*'s second part of the two-step analysis -- the court found: "Alternatively, even if Jenkins did not subjectively understand that his human-trafficking confession was admissible, Jenkins's expectation was not reasonable." (JA97)

A waiver is the intentional relinquishment or abandonment of a known right.  *United States v. Robinson*, 744 F.3d 293 (4th Cir. 2014) (citing *Wood v. Milyard*, 566 U.S. 463, 474 (2012).  "A knowing waiver is one made with full awareness of both the nature of the right being abandoned and

the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986)

Nothing in this record supports the conclusion that Jenkins knew about his rights under Rule 410. Nothing in this record demonstrates that Jenkins was aware of the nature of abandoning his rights under Rule 410. The record also fails to show any evidence that Jenkins was fully aware of the consequences of a decision to abandon the protections of Rule 410, of which he was completely unaware, and thus unable to knowingly waive.

If this Court affirms the district court's decision admitting the confession in this case, the policy favoring plea discussions will rest on the flimsiest of foundations. Future defendants should make no mistake that their interest in plea negotiations will always benefit the government and never benefit them. Prosecutors and law enforcement officers will quickly ensure that Rule 410 becomes void.

Prosecutors will be able to begin negotiations in every case with naïve defendants, make vague promises of uncertain future benefits, then begin videotaping the detailed confession resulting from a defendant's

foolish reliance on fair play.  They need not ever mention one's rights

under Rule 410. Immediately after the confession is obtained,  the

government need only "conclude" or "decide" that the defendant spoke

without absolute candor at some point, and move to admit the confession,

assured that the district court will find that the confession was obtained

"after plea negotiations ended." All this will occur without any written or

oral waiver of a defendant's Rule 410 rights.

The concerns voiced by the Justices in the minority in *Mezzanatto* will

come to fruition. Without the need for a knowing waiver required by the

Supreme Court in *Mezzanatto*, the practical certainty is that the waiver the

Supreme Court allowed will have "come to function as a waiver of trial

itself."

The district court's factual findings were clearly erroneous, and its

erroneous legal conclusions effectively erased the plain text of Rule 410.

### ii.      The district court's error was not harmless

"Confessions are by nature highly probative and likely to be at the

center of the jury's attention."  *United States v. Leon-Delfis*, 203 F.3d 103, 112

(1st Cir. 2000).  This is true, "especially where the government emphasizes

the confession in its closing argument because these are the last words

spoken by the trial attorneys." *United States v. Manning*, 23 F.3d 570, 575

(1st Cir. 1994).

The first and last time the government spoke directly to the jury, it

mentioned Jenkins confession.  The government closed its opening

statement with:

> Members of the jury, you will see a videotaped confession
> where the defendant describes doing the very things with
> which he is charged here today. After all of that, my co-counsel
> will come before you and ask that having heard all that
> testimony and seeing all that evidence, that you find the
> defendant guilty. (JA143)

During its first closing argument, the government mentioned Jenkins

statements made to law enforcement and played audio clips from his

confession eighteen times. (JA1064-1068, JA1071, JA1081-1084, JA1086,

JA1089-1091, JA1094, JA1130-1131)  The government also played a video

clip from his confession during its opening argument. (JA1086)

The government mentioned portions of the confession three times

during its final argument:

I want to talk a bit about the defendant's confession as a form of corroboration (JA1126);

The defendant's words, his own words in his confession and text messages reveal what was really going on here (JA1130); and

It's over the top. I mean, you heard it in the confession talk about it. It's a game. It's a game with him. And then listen about the way he talks about them in that confession. Their need for things like food, he laughs it off. Healthcare needs, laughs it off. I can't afford to take care of you. Whatever … I ask you to find him guilty on all counts. Thank you. (JA1131)

On this record, this Court is unable to say that the verdict was not substantially swayed by the district court's error allowing the government to play the two-hour movie confession. *See United States v. Abu Ali*, 528 F.3d 210, 231 (4th Cir. 2008) (citing *Kotteakos v. United States*, 328 U.S. 750, 765 (1946) (confessions to each of crimes charged before improper interrogation made error admitting it harmless.)

Moreover, the erroneous admission of a confession is rarely harmless and there is at least a reasonable probability that the confession admitted here in violation of Rules 410 and 11(f) might have contributed to Jenkin's convictions. *See United States v. Kweis*, 971 F.3d 453, 465 n.1 (4th Cir. 2020)

(Floyd, J., concurring in part and dissenting in part) (citing *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991), *United States v. Giddins*, 858 F.3d 870, 885 (4th Cir. 2017)).

Therefore, this Court should vacate the judgment and remand this case for a new trial.

II. **THE DISTRICT COURT SHOULD NOT HAVE ALLOWED A PEDIATRICIAN WITH NO KNOWLEDGE ABOUT THE CASE AND WHO NEVER MET ANY ALLEGED VICTIM WITNESSES, TO NEEDLESSLY TESTIFY AS AN EXPERT, RESULTING IN JURY CONFUSION ABOUT THEIR RESPONSIBILITY TO WEIGH AND DETERMINE WITNESS CREDIBILITY.**

A. **Standard of Review**

This court reviews a district court's decision to qualify an expert witness, as well as the admission of such testimony, for abuse of discretion." *United States v. Garcia*, 752 F.3d 382, 390 (4th Cir. 2014). "A court abuses its discretion if its decision is guided by erroneous legal principles or rests upon a clearly erroneous factual finding." *Id*. (internal quotation marks omitted).

## B.     Specific Facts and Relevant Law

Dr. Cooper had never treated or interviewed the women who would testify and knew nothing about the case. Prior to trial, Jenkins moved to prohibit her testimony or in the alternative limiting her testimony, citing Fed.R.Evid. Rules 403, 702 and 704. (JA101-106).

Jenkins maintained that (1) any probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury; (2) much of Dr. Cooper's general testimony is unrelated to this case and would stain Jenkins with negative evidence associated with other sex traffickers; (3) because Dr. Cooper cannot apply the general information to these case facts (of which she is ignorant) it violates Rule 702, would be a waste of time and would confuse the jury; (4) her testimony would lead the jury to improperly speculate whether they should apply her generalizations to Jenkins and Wallace to establish *mens rea* (thus the government would obtain what they said they would not elicit in violation of Rule 704(b); and (5) her definition of sex trafficking would confuse the jury because her definition is broader than the instruction the district court should use.

The district court ruled to allow the testimony, citing Rules 702 and

403:

> I do think that …testimony helping to explain sex trafficking and child sexual exploitation will help the jury understand the dynamics of the case …. The testimony will at least help to explain potentially confusing dynamics outside the normal knowledge of a lay juror ….(JA120)

> I have done the balancing under Rule 403 and find that the testimony is admissible, having done the balancing. The proposed testimony does not embrace any ultimate issues associated with either *mens rea* or anything else in the case. (Regarding Jenkins' concern that Dr. Cooper's definition of sex trafficking is broader than the court's instruction) The jury will know that I'm the one instructing them on the law, and I will also give a proper opinion testimony instruction.  So that motion is denied for those reasons. (JA121)

To be admissible, testimony must be relevant to the issues in the case.

Under Federal Rules of Evidence 401 and 402, evidence is relevant if it

tends to make the existence of any *pertinent* fact more or less probable. *See*

Fed.R.Evid. 401, 402. (emphasis added)

The government's final witness was Dr Sharon Cooper, a board-

certified pediatrician. (JA910)  The government called her to testify

generally about sex trafficking. (JA920)  She reviewed no case materials,

conducted no witness interviews from anyone who was called to testify and said, "I do not have any knowledge about the facts of this case." (JA920)  Cooper stated, "The purpose of my testimony is to provide education to the jury and/or the judge because (sex trafficking) is a form of victimization that many people do not fully understand." (JA921)

Cooper said that in literature from five to seven years ago, pimps were seen as falling into two categories: those who recruited through love and romance or those who used brute force "to keep them under control." (JA921)  Cooper then testified that:

Recent literature related to gang involvement in sex trafficking includes wealthy pimps, "individuals who have a lot of money" whose wealth" will convince a potential victim to join in the sex trafficking ring. (JA921) No evidence had shown that either Wallace or Jenkins fit this description.

Cooper also mentioned literature about "a drug supplier pimp."  She described this type of pimp as one who:

maintains control over a victim by giving them drugs so that when the victim starts to experience withdrawal from drugs,

the pimp coerces them to perform sexual acts, and will give them drugs to maintain control over them. (JA921-922)

No evidence had shown that Jenkins or Wallace used drugs to

maintain control over the women.

Cooper also testified about the "culture of pimping."

In fact, there's a particular whole language in pimping that most people do not know anything about. There are lots of terms that would be meaningless unless you really understood the culture of pimping. One of them, for example, is called choosing up. That's when a victim might be standing in a group of pimps. And if it's a female victim, she may glance at another pimp, not the one who has control of her, and that's referred to as her having been bold enough to look at another pimp; that means that she has chosen up, meaning that she now wants to belong to that pimp. (JA924)

No evidence related in any way to "choosing up."

Cooper went on:

When the pimp is a boyfriend or a husband, women and girls who belong in that family refer to each other as wife-in-laws. That's what they call each other. This is my wife-in-law because they're all married to that pimp who is their husband. They're not legally married, but they see themselves as common law wives to that individual, and they often will jockey among each other, be competitive to try to be the one that that pimp is going to love the most. (JA924-925)

This had nothing to do with the facts of this case.

Cooper also explained that in the pimp culture, pimps will change the victims' names. She described the purpose of the name change:

> There's no legal change in the name, but they change the victim's name so the victim believes that they are in a new life. Remember that the terminology for being a victim of sex trafficking is referred to as "the life." So they now have a new name in this life. And the names are often geological: Diamond, Emerald, Sapphire, lots of precious jewel names. (JA926) Cooper opined that the purpose behind the name change: "to convince the victim that they can set everything behind them, that they can make a lot of money, and to raise their self-esteem." (JA927)

The evidence in this case showed only that the women used pseudonyms to advertise on Backpage.

Dr. Cooper also testified about common risk factors possessed by many sex trafficking victims. (JA927-929) She pointed out that victims of child sexual abuse risk becoming victims, then added:

> The issue of child sexual abuse, especially if it occurs recurrently in the life of a child, which it often does, will many times cause a child to sort of dissociate herself or himself from the sexual encounters so that being sexually assaulted by other people is wounding, but not as wounding as one might be if it was the first time you were ever sexually assaulted. So, therefore, when we look at trafficking victims who get sexually assaulted many times, eight to ten times a night or a day, seven days a week, when we see that type of victim who has child

sexual abuse in their background, what we know is that the risk for having significant mental health problems are going to be even greater than it would be for an individual who's never been a victim of child sexual abuse. The other piece of it is that if you've been sexually abused chronically as a child, it's very easy for a pimp to convince you -- and this is frequently written about in the literature. It's very easy for a pimp to convince you this is what you were meant to be for because you have this history in your life. And by giving that kind of message to a victim causes the victim to become more compliant with the victimization. (JA936-937)

The facts in this case were quite different and unrelated to this lengthy narration. No evidence showed the level of child sexual abuse described by Dr. Cooper.

Asked whether victims will remain loyal "after they have left or escaped," Dr. Cooper replied:

Exceedingly so. I have seen so many cases, evaluated so many victims where even when rescued, they are still seeking to support the offender and sometimes will try to continue to provide sexual work so that they can make the money that they make available to the offender. (JA942)

In this case, the women who left did not thereafter seek to support Jenkins and Wallace and did not continue to provide sexual work. The women did not "escape" but left on their own volition.

The government asked whether branding is a form of control, to

which Dr. Cooper replied:

> Yes. Branding is very common. Many traffickers have their own
> tattoo that is specific to them, and they often will have their
> victims tattooed with that particular one. Sometimes it's
> personally made for them. And by doing so, just as you would
> tattoo or brand an animal, it shows ownership on the part of
> that offender of that particular victim. (JA946)

No "branding" occurred in this case.  The government inquired

about "branding" because one woman maintained a romantic relationship

with Wallace after she moved away to Raleigh.  She got a tattoo, a common

experience for young women interested in body art.

The government asked whether control can exist when the pimp and

victim are in different locations.  Dr. Cooper replied:

> It often can exist outside of face-to-fact contact. Many times it's -
> - the evidence of that ownership and control is digitally
> apparent because they many times will communicate digitally
> with a victim. Sometimes offenders, and I've testified  in cases
> like this, where an offender may have been intercepted by law
> enforcement, but still communicates with the victim and says
> you need to still be out there making money for my bail, in fact.
> And so they do not necessarily have to be face to face all the
> time in order for power and control to still be exercised over the
> victim. (JA946-947)

Absolutely no evidence in this trial related to the experience she described, despite Dr. Cooper's willingness to testify to that effect in this trial and others.

Dr Cooper next responded to the question, "why don't the victims just leave? She stated:

> Similar to domestic violence circumstances in relationships, very often victims don't leave because they believe what the trafficker has been telling them. They believe that they're no good for other things than for what they are being put out in the streets to do. And they also believe that no one else will care for them as much as the trafficker will because the trafficker will be on a high at certain times and happy because they've made their quota or brought in some money and then can become very angry if they don't bring in their money. But the point is that the victim will come to believe that it's their actions that's keeping that relationship together, and so they become more bonded to the victim – to the offender in that situation. (JA947)

In this case, the women left for better opportunities. On January 19, 2016, the day Wallace and Jenkins were arrested, Jazz was with Jenkins in Wallace's vehicle. Wallace said he allowed Jenkins to use his vehicle to drop Jazz off at the local community college on Jenkins way to his

electrician job.  The prostitution scheme had ended on October 20, 2015,

three months before the arrest. (JA29)

When asked, "in your experience how do victims interact with law

enforcement," Dr. Cooper responded:

> When victims interact with law enforcement, they're typically
> distrustful because they've been told by the trafficker and
> others that they can't be trusted; law enforcement cannot be
> trusted. (JA950)

The only evidence even remotely similar to Dr. Cooper's statement

was that the women asked potential customers if they were "law

enforcement" based on some myth that such a question would enable them

to avoid arrest for prostitution.

Government counsel asked: is it common for a pimp to actually

instruct the victims on how to interact with law enforcement? She

answered:

> Yes, it is. Not only is it common, I have worked in cases where
> offenders actually videotaped themselves speaking to the
> victims and telling them exactly what to say; to make sure that
> they said they were older than 18; to make sure that they even
> had a Social Security number that was the Social Security
> number of another person in the organization who was an
> adult, so that if the victim gave that Social Security number

upon being arrested by law enforcement, the person who
would come up would be over the age of 18. So not only has
my personal experience in working in cases validated this
phenomenon, I've also interviewed numerous victims where
this has also been reported. (JA951)

If Dr. Cooper had become familiar with the facts of this case, or

spoken to the women involved, she would have known that, despite her

prior experiences, none of what she described had occurred in this case.

The last two questions the government asked were about long term

and life-long effects upon sex trafficking victims. Dr. Cooper stated:

There are several medical problems that victims have.
They fall into four categories. One has to do with physical
violence and all of the problems that you can have if there's
been physical violence, the two most important dynamics of
which are untreated traumatic brain injury and patients who
have had physical violence associated with strangulation.
The second category is that of drug use and misuse. Very
often victims are given drugs or they will start to try to
find drugs in order to cope with what is happening to them.
And this can lead to not just habituation, but actually
addiction. So that's a second dynamic that we see medically.
The third has to do with all of the gynecological for
women and anal/rectal for men ramifications of having to have
sexual contact with multiple people a day over many, many
days, weeks, months, and maybe even years. Many, many
physical complications associated with that, not the least of
which are infectious diseases such as hepatitis and HIV.
And then the final category of the medical complications

has to do with the psychological impact. The three most
common diagnoses are going to be PTSD, depression and
 anxiety. (JA954-955)

The government ended direct examination with a final question:

Q: "Are these impacts enduring over the victim's lives?

A: Very much so. I have worked in this field for some time
now, and I have interacted with many survivers (sic) who are
30 years out from having been sexually exploited in this
manner, and the quality of their life is profoundly significantly
impaired. Many of them are disabled for life. (JA954-955)

Speculative "long term and life-long" effects on sex trafficking

victims have absolutely no probative value during trial on the merits. Such

evidence is clearly unduly prejudicial and should never be raised during

the trial phase of criminal cases.

All the above testimony demonstrates that the district court failed to

provide the gatekeeping function required by Rule 403.

Dr. Cooper's testimony shown above was irrelevant to this case's

issues and instead was introduced simply to shock the jury about unrelated

potential horrors of human trafficking. The above testimony failed to give

context to the women's testimony, because their testimony was unrelated

to Dr. Cooper's general testimony about sex traffickers. The undue

prejudice of the admitted testimony substantially outweighed any

probative value specific to this case and it prejudiced the jury unfairly

against Jenkins.

## III. THE DISTRICT COURT IMPOSED AN UNREASONABLE SENTENCE.

### A. Standard of Review

This court reviews the reasonableness of a sentence under 18 U.S.C. §

3553(a) using an abuse-of-discretion standard." *United States v. Nance*, 957

F.3d 204, 212 (4th Cir. 2020).

This Court first ensures that the district court committed no

significant procedural error, such as improper Guidelines calculation,

failing to consider the § 3553(a) factors, or inadequate explanation for the

sentence. *Gall v. United States*, 552 U.S. 38, 51 (2007).

### B. Relevant Law

A sentence is procedurally reasonable when the district court

considers the defendant's non-frivolous arguments for downward

departure, imposes an individualized sentence based on the characteristics

of the defendant and the facts of the case, and explains the sentence chosen. *United States v. Blue*, 877 F.3d 513, 518 (4th Cir. 2017).

Substantive reasonableness review considers the totality of the circumstances to determine whether the sentencing court abused its discretion when its sentence did not satisfy the 18 U.S.C. § 3553(a) standards. *United States v. Nance*, 957 F.3d 204, 212 (4th Cir. 2020) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)).

## C. The sentence was procedurally unreasonable

Jenkins objected to the guidelines range of "life in prison" based on offense level 43, criminal history category II. (JA1384). Jenkins requested a sentence less than life arguing that he had grown up in an enormously abusive home, but he rose above it and graduated from high school and played football while attending Western Carolina University. (JA1385) Jenkins managed to play briefly in the National Football League. (JA1385) After serving time for his no contest plea to second degree murder, he sought to better himself by taking community college classes and pursued gainful employment as an electrician. (JA1385)

If Jenkins' guidelines objections had been sustained, the resulting bottom of the range would have been 210 months, and he requested a sentence below 210 months. (JA1385-1386).

Jenkins argued for that sentence because he used his education and sports talents despite his impoverished upbringing in an abusive home to avoid the bad path his brother had taken. (JA1385-1386).

The district court chose not to consider that argument, "Okay. So we're going that far back in time." (JA1386).

After the government argued for a life sentence, the district court stated that it had considered all the arguments made by Jenkins' counsel. (JA1394). However, the district court, rather than explaining why it found those arguments unpersuasive, said that Jenkins had "some college" and the "report does suggest that you were subject to some abuse as a child". (JA1397). The district court said those arguments did not justify a downward variance to below 210 months, because they occurred when Jenkins was "in your twenties." The court also ignored without discussion

Jenkins' positive steps seeking education and legitimate employment as an electrician. (JA1397).

The district court's sentencing procedure suffers from the same deficiencies this Court explained in *Blue*. In that case, Blue, a career offender, pleaded guilty to armed bank robbery and brandishing a firearm during a crime of violence. *Blue*, 877 F.3d at 516. His guideline range was 188 to 235 months for the bank robbery. Blue requested between 92 and 115 months and argued that (1) he was influenced by his older brothers, (2) he committed the robbery to support an opiate addiction, (3) he worked hard at his employment, (4) he was a good father, (5) his codefendant received a sixty-three month sentence, (6) the career offender guideline is overly harsh and (7) he accepted responsibility and attempted to render substantial assistance. *Id*. The Government asked for a low-end sentence (92 months) *Id.*

The district court imposed 188 months for the robbery, stating it considered the advisory guideline range and found the sentence was "sufficient, but not greater than necessary, to meet the sentencing objectives of [§] 3553." *Blue*, 877 F.3d at 517. The court explained it had:

[C]onsidered arguments on behalf of [Blue] with respect to history and characteristics. The Court notes [Blue]'s substantial criminal history category and the seriousness of the offense. The Court notes [Blue], with respect to his history and characteristics as well, was influenced a great deal by an older sibling who had a history of engaging in similar criminal activity. The Court notes as well Defendant has experienced a substantial opiate addiction which has contributed to some of his conduct in this case. *Id*. at 520.

This Court found that explanation inadequate. *Blue*, 877 F.3d at 521.

The sentence suffered from three procedural errors: First, the district court did not explain how the § 3553(a) factors or their principles shaped its sentencing decision. Second, the record did not show that Blue was immune to other means of deterrence. Finally, the district court simply heard the arguments for a downward departure but had not engaged counsel about its merits *Id*. Deprived of the ability to conduct meaningful appellate review, this Court vacated and remanded the case for resentencing.

Here, the district court failed to articulate adequate reasons why a sentence less than three consecutive life sentences, was insufficient to satisfy the goals of 18 U.S.C. § 3553(a).

Moreover, just as in *Blue*, nothing during this sentencing hearing made it "patently obvious" that the court found all Jenkins' arguments unpersuasive. The district court essentially shaped its sentence under just one or two of the § 3553(a) sentencing factors. *See   Blue*, 877 F.3d at 521.

**D.     The sentence was substantively unreasonable**

The totality of circumstances demonstrates that three consecutive life sentences are substantively unreasonable.

First, Jenkins, then 48 years old at the time of sentencing would be over 63 years old upon release from the BOP, under the sentence he sought, even if he received full gain time credits. Studies show an inverse relationship to recidivism risk with age. Jenkins was not a career offender or de facto career offender.

In *United States v. Howard*, 773 F.3d 519 (4th Cir. 2014), this Court reversed *one* life sentence as substantively unreasonable for a defendant also near Jenkins' age. This Court relied on studies showing an inverse relationship between age and recidivism risk, for de facto career offenders

and noted that in its prior affirmed cases for de facto career offenders, none of those defendants received a life sentence. *Howard*, 773 F.3d at 531.

Jenkins' efforts to rehabilitate himself through education and pursuit of employment, both before and after serving his prior prison sentence demonstrate he is not permanently incorrigible and does not presenting the recidivism risk of one deemed to be a career offender.

Wallace, the co-defendant in this case, who created and ran the prostitution enterprise, received a sentence of 156 months.. *See United States v. Antoine Wallace*, 5:18-cr-451-D-2, DE 251-52) (E.D.N.C. Sept. 8, 2021). Wallace testified that he had received all the money earned by the prostitutes and he had brought Jenkins into the business as his "assistant pimp." (JA1389) Much of Jenkins' criminal liability was as an aider and abettor to Wallace.

Under § 3553(a)(6), an important sentencing factor addresses the need to avoid unwarranted sentencing disparities. Substantially all the district court's concerns about the offense conduct in this case apply equally to both Jenkins and Wallace. Wallace cooperated so the district

court no doubt gave him some credit for that after he had pleaded guilty to one count of sex trafficking a minor.  His sentence of 156 months was significantly lower than a life sentence.  His sentence was also less than the nationwide mean and median sentences for all of federal sexual abuse offenses in 2021 (the mean sentence length was 211 months and the median sentence length was 180 months). [5]

Jenkins' three consecutive life sentences qualitatively far exceed both Wallace's sentence and the nationwide mean and median sentences for sexual abuse crimes. *See United States v. Baker*, 539 Fed. App'x 299 (4th Cir. 2013) (No. 12-5025) (unpublished) (life sentence imposed unreasonable because Baker's conduct was comparable to that of her co-conspirators rather than more culpable witnesses for the government).

Certainly "not every variation is unwarranted" between co-defendants, *United States v. Friend*, 2 F.4th 369, 383 (4th Cir. 2021), but the

---

[5] U.S.S.C. Sourcebook of Federal Sentencing Statistics, Fiscal Year 2021, Table 15, available at: https://www.ussc.gov/sites/default/files/pdf/ research-and- publications/annual-reports-and-sourcebooks/ 2021/Table15.pdf (last visited Oct. 10, 2022).

variation here is between 156 months and three consecutive life sentences

for those whose relevant conduct no doubt shared similar offense behavior.

Under the totality of the circumstances, Jenkins' sentence is

substantively unreasonable. *See United States v. Killen*, 729 Fed. App'x 703,

717-18 (11th Cir. 2018) (No. 15-15001) (unpublished) (reversing 139-year de

facto life sentence as substantively unreasonable when the district court

failed to consider unwarranted disparities in sentencing).

As this Court reasoned in *Howard*:

> [R]eview for substantive reasonableness, however, demands
> that we proceed beyond a formalistic review of whether the
> district court recited and reviewed the § 3553(a) factors and
> ensure that the sentence caters to the individual circumstances
> of a defendant, yet retains a semblance of consistency with
> similarly situated defendants. *Howard*, 773 F.3d at 531 (internal
> citation and quotations omitted and emphasis added).

Here, the district court focused almost extensively on a single

factor—the nature and circumstances of the offense—"and it did so at the

expense of a reasoned analysis of other pertinent factors." *Howard*, 773 F.3d

at 531. When this occurs, the district court fails to impose a sentence that is

a "fair and just result in light of the relevant facts and law." *Id*. (internal

quotations and citations omitted).

The district court's theory of individual deterrence and need for incapacitation to protect the public also received undue emphasis and was based upon erroneous facts. Even had the district court imposed a sentence of 210 months, the likelihood that Jenkins will recidivate upon his release is substantially lower that what the district court assumed as a certainty. (JA1398)  The district court ignored the fact that the risk of recidivism is "inversely related to an inmate's age." *See United States v. Webb*, 965 F.3d 262, 270 (4th Cir. 2020) (finding life sentence unreasonable because a shorter sentence would have been sufficient but not greater than necessary based on appellant's age).

This Court reversed the life sentence in *Howard* because he did not fit the description of a "notorious drug lord at the top of an unremittingly violent and widespread organization" that is, a type for whom life sentences are appropriate.  Jenkins also does not fit that description. Jenkins worked for Wallace's prostitution ring for less than one year and the operation had ceased three months before Jenkins was arrested while driving Jazz to her community college class on his way to his legitimate job.

The district court, imposing three consecutive life sentences, failed to recognize that at the time of his arrest, Jenkins had moved on from the conduct that formed the basis of the jury verdict in this case. Jenkins had already begun demonstrating some capacity for rehabilitation under § 3553(a), a factor equally important as the nature and circumstances of the offense, the driving factor behind the sentences he received.

"Sentencing courts remain obligated not to 'give excessive weight to any relevant factor' and to impose a sentence 'which effect[s] a fair and just result in light of the relevant facts and law.'" *United States v. Tucker*, 473 F.3d 556, 562 (4th Cir. 2007) (quoting *United States v. Green*, 436 F.3d 449, 457 (4th Cir. 2006)). The totality of the circumstances show that in Jenkins' case, the district court did not effect "a fair and just result": A sentence of three life sentences is substantively unreasonable, and this Court should vacate and remand for resentencing.

## CONCLUSION

Jenkins received an unfair trial because the district court erroneously admitted a two-hour video confession, the last evidence seen in the

government's case in chief, and the government made the confession key components of its opening statement and opening and closing arguments.

The district court abandoned its responsibility under Rule 403, by allowing expert testimony by one with no knowledge of this case's facts, to unduly prejudice Jenkins with irrelevant evidence.

The district court imposed three consecutive life sentences after stating that it would impose a sentence "sufficient but not greater than necessary to achieve the goals of sentencing." The consecutive life sentences were unreasonable. This Court should vacate the judgment and remand for a new trial.

## REQUEST FOR ORAL ARGUMENT

Undersigned counsel requests oral argument.

Respectfully submitted this 13th day of October 2022.

/s/ Joseph B. Gilbert
Joseph B. Gilbert
TARLTON LAW PLLC
P. O. Box 91624
Raleigh, NC 27675
(919) 630-0286

*Counsel for Appellant*

# CERTIFICATE OF COMPLIANCE

1.    This document complies with type-volume limits because, excluding

the parts of the document exempted by Fed. R. App. P. 32(f) (cover

page, disclosure statement, table of contents, table of citations,

statement regarding oral argument, signature block, certificates of

counsel, addendum, attachments):

    this document contains <u>12,261</u> words.

2.    This document complies with the typeface requirements because:

    This document has been prepared in a proportional spaced typeface using Microsoft Word in <u>14-point Palatino Linotype</u>.

Respectfully submitted this 13th day of October 2022.

<u>/s/ Joseph B. Gilbert</u>
Joseph B. Gilbert
TARLTON LAW PLLC
P. O. Box 91624
Raleigh, NC 27675
(919) 630-0286

*Counsel for Appellant*