# No. 21-4447

# United States Court of Appeals
# for the Fourth Circuit

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

JONATHAN LYNN JENKINS,

*Appellant.*

*On Appeal from the United States District Court
for the Eastern District of North Carolina*

## RESPONSE BRIEF OF THE UNITED STATES

MICHAEL F. EASLEY, JR.
*United States Attorney*

BY:  DAVID A. BRAGDON
LUCY PARTAIN BROWN
*Assistant United States Attorneys*

150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
Telephone: (919) 856-4530

*Attorneys for Appellee*

# TABLE OF CONTENTS

Table of Authorities ..................................................................................... iii

Statement of Jurisdiction................................................................................ 1

Statement of Issues ........................................................................................ 2

Statement of Facts ......................................................................................... 3

Summary of Argument ................................................................................. 32

Argument ..................................................................................................... 33

**I.    Defendant provided a confession pursuant to completed plea negotiations, and it was properly admitted at trial, as all involved parties understood it would be.**

    A.    Standard of Review.................................................................. 33

    B.    Discussion of Issue. ................................................................ 33

**II.   Dr. Cooper was properly admitted as an expert, and because her testimony aided the jury's understanding of human trafficking, it did not run afoul of Rule 403.**

    A.    Standard of Review.................................................................. 37

    B.    Discussion of Issue. ................................................................ 38

        1.    The district court properly admitted Dr. Cooper as an expert witness ........................................................ 38

        2.    Dr. Cooper's testimony did not run afoul of Rule 403......................................................................... 42

**III.** **Defendant's within-guidelines sentence was procedurally and substantively reasonable**

    A.    Standard of Review. ................................................................. 37

    B.    Discussion of Issue. ................................................................ 47

           1.    Defendant's sentence was procedurally reasonable because the district court acknowledged his arguments but found them unpersuasive ..................... 48

           2.    Defendant's within-guidelines sentence is substantively reasonable ................................................. 49

Conclusion ................................................................................................. 52

Certificate of Compliance

# TABLE OF AUTHORITIES

## Cases

*Chavez-Meza v. United States,*
138 S. Ct. 1959 (2018)................................................................ 48

*Greer v. United States,*
141 S. Ct. 2090 (2021)............................................................... 38

*Gurney Indus., Inc. v. St. Paul Fire & Marine Ins. Co.,*
467 F.2d 588 (4th Cir. 1972) ................................................. 35

*Holguin-Hernandez v. United States,*
140 S. Ct. 762 (2020) .............................................................. 49

*Hutto v. Ross,*
429 U.S. 28 (1976) (per curiam) .......................................... 34

*Kopf v. Skyrm,*
993 F.2d 374 (4th Cir. 1993) ................................................ 39

*Rita v. United States,*
551 U.S. 338 (2007)................................................................ 48

*United States v. Anderson,*
851 F.2d 384 (D.C. Cir. 1988) .........................................39, 40

*United States v. Brinson,*
772 F.3d 1314 (10th Cir. 2014).............................................. 40

*United States v. Bryant,*
654 F. App'x 807 (6th Cir. 2016) (unpublished) ................ 40

*United States v. Burch,*
156 F.3d 1315 (D.C. Cir. 1998) ............................................ 34

*United States v. Carson,*
870 F.3d 584 (7th Cir. 2017) ............................................39, 40

*United States v. Cowan,*
  Nos. 95-5508, 95-5509, 1996 WL 521049
  (4th Cir. Sept. 16, 1996) (unpublished)....................................................34

*United States v. Devine,*
  40 F. 4th 139 (4th Cir. 2022) ....................................... 47, 48, 49

*United States v. Fowler,*
  948 F.3d 663 (4th Cir. 2020) ....................................................50

*United States v. Geddes,*
  844 F.3d 983 (8th Cir. 2017) ....................................................40

*United States v. Grimmond,*
  137 F.3d 823 (4th Cir. 1998) ....................................................43

*United States v. Hare,*
  49 F.3d 447 (8th Cir. 1995) ....................................................34

*United States v. Hassan,*
  742 F.3d 104 (4th Cir. 2014) ...............................................38, 43

*United States v. Hornbuckle,*
  784 F.3d 549 (9th Cir. 2015) ....................................................40

*United States v. Jennings,*
  860 F. App'x 287 (4th Cir. 2021) (unpublished) ......................................40

*United States v. Knight,*
  867 F.2d 1285 (11th Cir. 1989)....................................................34

*United States v. Lighty,*
  616 F.3d 321 (4th Cir. 2010) ....................................................33

*United States v. Marks,*
  209 F.3d 577 (6th Cir. 2000) ....................................................34

*United States v. Marshall,*
  946 F.3d 591 (D.C. Cir. 2020) ....................................................40

*United States v. Mohr,*
318 F.3d 613 (4th Cir. 2003) ..............................................42, 43

*United States v. Morehouse,*
34 F.3d 381 (4th Cir. 2022) ................................................... 47

*United States v. Powers,*
40 F. 4th 129 (4th Cir. 2022) ................................................ 48

*United States v. Pulley,*
987 F.3d 370 (4th Cir. 2021) ................................................ 33

*United States v. Robertson,*
582 F.2d 1356 (5th Cir. 1978) ( en banc) .............................18, 34

*United States v. Stevens,*
455 F. App'x 343 (4th Cir. 2011) (unpublished) ....................... 33

*United States v. Taylor,*
239 F.3d 994 (9th Cir. 2001) ..............................................39, 40

*United States v. Warren,*
774 F. App'x 778 (4th Cir. 2019) (unpublished) ...................39, 40

*United States v. Watkins,*
85 F.3d 498 (l0th Cir. 1996) ................................................. 34

*United States v. Williams,*
116 F. App'x 890 (9th Cir. 2004).......................................... 40

*United States v. Wilson,*
484 F.3d 267 (4th Cir. 2007) ................................................ 37

## Statutes

18 U.S.C. § 2 .......................................................................3

18 U.S.C. § 922(g)(1) ..........................................................3

18 U.S.C. § 924 ...................................................................3

18 U.S.C. § 3231 ............................................................... 1

18 U.S.C. § 3553(a) ......................................................48, 49

18 U.S.C. § 3742(a) .......................................................... 1

18 U.S.C. § 1591 ............................................................... 3

18 U.S.C. § 1594(c) .......................................................... 3

18 U.S.C. § 1952(a)(3) .................................................... 3

28 U.S.C. § 1291 ............................................................... 1

## Rules

Fed. R. Evid. 401 ............................................................ 42

Fed. R. Evid. 403 ..................................................... passim

Fed. R. Evid. 410 .......................................................17, 33

Fed. R. Evid. 702 .................................................. 21, 37, 38

Fed. R. Evid. 704 .......................................................... 21

## Sentencing Guidelines

U.S.S.G. § 5G1.2, n.1 ..................................................... 50

## Other Authorities

11 Williston on Contracts § 32:14 (4th ed. 2020) ......................................... 35

# STATEMENT OF JURISDICTION

Defendant Jonathan Lynn Jenkins appeals from a judgment of conviction following a jury trial. Jurisdiction to the district court was established by 18 U.S.C. § 3231.

Jurisdiction to this Court is provided by 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). The judgment was entered on August 11, 2021, followed by an amended judgment on August 12, 2021. Defendant filed a timely notice of appeal on August 25, 2021. After restitution was decided, a new notice of appeal was timely filed on December 7, 2021.

# STATEMENT OF ISSUES

1.    Whether the district court erred in denying Defendant's motion to suppress and permitting the introduction at trial of his confession that was provided as the result of completed plea negotiations and which Defendant understood would be used against him?

2.    Whether the district court erred in permitting a doctor specializing in sex trafficking to testify as an expert to educate the jury on the unique terms and dynamics of sex trafficking?

3.    Whether the district court's sentence was procedurally and substantively unreasonable where it considered Defendant's limited mitigation arguments and imposed a thoroughly-explained, within-guidelines sentence?

# STATEMENT OF FACTS

## Procedural History

The grand jury indicted Defendant Jonathan Lynn Jenkins, also known as "Max," on charges of conspiracy to commit sex trafficking by force, fraud, and coercion and of a minor, in violation of 18 U.S.C. §§ 1591(a), (b)(1), (b)(2) and 1594(c) (Count One);[1] sex trafficking by force, fraud, and coercion of a minor and aiding and abetting, in violation of 18 U.S.C. §§ 1591(a), (b), and 2 (Count Two); sex trafficking of a minor and aiding and abetting, in violation of 18 U.S.C. §§ 1591(a), (b)(2), and 2 (Count Three); use of the internet to promote an unlawful business enterprise (ITAR) and aiding and abetting, in violation of 18 U.S.C. §§ 1952(a)(3) and 2 (Count Four); and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) and 924 (Count Five). J.A. 29–34. Codefendant Antoine Lamar Wallace, "Tweezy," was also charged in Counts One through Four. J.A. 29–32.

Defendant pled not guilty. J.A. 10. A jury convicted him of all counts at a week-long trial. J.A. 14–15; J.A. 1362–1366. At sentencing, his guidelines range was life, and the district court sentenced him to three consecutive life sentences. J.A. 1380–1381, J.A. 1399. Defendant appealed.

---

[1] Defendant was indicted on two theories of liability of "force, fraud, or coercion," but the government did not move forward on the "venture" theory at trial.

## Offense Conduct

Following his release from prison for murder, Defendant took up a new enterprise: sex trafficking young women and girls. With the help of his nephew and co-pimp, Antoine Wallace, Defendant ran a human trafficking business in Johnston County, North Carolina, for about a year, using manipulation, violence, and fraud.

Wallace began pimping in the fall of 2014. J.A. 706. Inexperienced, he soon enlisted the help of his uncle, Defendant, who "grew up watching" a family legacy of pimping and had the "criminal justice knowledge" from school and prison to manage the enterprise. J.A. 1224–1225. In all, the sex trafficking conspiracy involved five main victim/prostitutes, though several others came and went as well.

The first victim involved was A.H. ("Goldie"), who was down on her luck living in a "bedbug ridden Luxury Inn" with her children and their father, who was not "doing anything to help her," when she met Wallace and let him know "she wanted to work." J.A. 1224.

Soon thereafter, Defendant and Wallace recruited B.H. ("Princess") from another man they knew. J.A. 1227. B.H. had been raised by a foster-turned-adoptive mother, who would drunkenly let her nine children "know that she didn't want [them] and it was for the check." J.A. 315–316. As a teenager, B.H. joined the Bloods gang and spent time in juvenile detention and a psychiatric residential treatment facility before running away from her adoptive mother. J.A. 316–317, J.A. 320. When B.H. joined the group, it soon became clear she

had no experience with prostitution, but she "really didn't have another option," so she stayed and worked as well. J.A. 325. She was seventeen years old.[2] J.A. 322.

B.H. then recruited M.J., whom she knew from juvenile detention. J.A. 319. M.J. grew up in and out of group homes, after having been molested and raped and "running away a lot." J.A. 448. After release from a group home in later 2014, she contacted B.H. because she had nowhere to go. J.A. 451. Wallace and B.H. picked up M.J. and brought her to join the group, where she soon met Defendant. J.A. 451–452. At the time, M.J. had "about two pair[s] of pants and a few shirts" to her name, without a cellphone or identification. J.A. 454–455. She was seventeen years old. J.A. 450.

J.R. ("Jazz(y)") joined the group in early 2015 at the age of nineteen. J.A. 533. She had been raised by a great-aunt after her mother sided with her abuser following a sexual assault. J.A. 531–532. Consequently, J.R. began running away and living in a residential facility. J.A. 532. She had been prostituting some "to make money and make a living and feed [her]self" when she reencountered an old acquaintance, Wallace. J.A. 533–534. J.R. told Wallace her situation, and he soon offered to "help" her by bringing her into the trafficking organization. J.A. 534–535.

---

[2]  The jury did not find that Defendant acted "knowing or in reckless disre-gard of the fact . . . that B.H. had not attained the age of 18." J.A. 1364.

When J.R. eventually had fewer clients than expected of her, she was instructed to begin recruiting new girls, including one named R.H. ("Dutchez"), whom she met on a dating app. J.A. 592. Defendant instructed J.R. to look for girls that "were abandoned, didn't have anywhere to stay, that were looking to make money," and R.H. was that. J.A. 582. R.H. had grown up with her aunt and suffered sexual abuse in her middle school years. J.A. 652–653. When J.R. encountered her, she was working as an exotic dancer in South Carolina. J.A. 652. She was eighteen years old. J.A. 651.

The sex trafficking conspiracy ran like the business it was, with rules and common practices. When victims were first recruited, Defendant and Wallace would "test" them by having sex with them however they wanted. J.A. 378, J.A. 660. They then marketed the victims' services. They were required to accept all jobs and work "[a]ll day, every day," even if calls came at 2:00 in the morning. J.A. 345, J.A. 369, J.A. 561. If they were menstruating, they were instructed to use a makeup sponge and continue working. J.A. 345. At times, victims would see six to ten clients per weekday and double on weekends. J.A. 346. Defendant set the rules for their "dates," including that they were never to touch the money and that he would be on site as "security." J.A. 344. Defendant set all the prices, and all money earned went to Defendant and Wallace. J.A. 344–345, J.A. 672, J.A. 718, J.A. 1238.

Defendant imposed strict rules on the victims, requiring them to "just . . . be the perfect bitch." J.A. 370. They were to call Wallace "Daddy." J.A. 369, J.A. 761. They were to clean his house and take care of his children. J.A.

369–370, J.A. 761. In public, they were to walk on either side of him and open every door before he could touch it. J.A. 370. Failure to follow these rules would result in being choked out or punched in the chest "or whatever type of punishment they felt was feasible at the moment." J.A. 370.

For marketing, Defendant advertised on a website called Backpage, a classifieds website primarily used to find prostitutes. J.A. 158–159. Though occasionally the victims assisted, Defendant was primarily responsible for writing and posting their ads for Backpage and taking the accompanying photos. J.A. 342, J.A. 663–665. Defendant also took more explicit photos of them, featuring nudity and suggestive poses. J.A. 666.

The prostitution business took place at a few locations. First, they worked in hotels in Smithfield, North Carolina. J.A. 472–473. Eventually, Defendant and Wallace rented a duplex in Four Oaks, North Carolina. J.A. 271, J.A. 349–350. At first, the duplex was unfurnished, and the victims slept on the floor. J.A. 349. Eventually, Defendant and Wallace bought them air mattresses to see clients and to sleep on. J.A. 350. Defendant lived there with them and had sex with them as he wished. J.A. 379, J.A. 424, J.A. 474–475, J.A. 537. Wallace lived at a house on Serenity Drive with his longtime girlfriend and children and, sometimes, some of the victims. J.A. 239, J.A. 348, J.A. 423, J.A. 630. This was the main location where the victims were expected to clean, cook, and provide childcare. J.A. 373, J.A. 564.

Defendant used a wide variety of methods to control the victims and "abuse their mind[s] . . . every day." J.A. 1263. At times, especially when

victims first joined the group, he would treat them with care, even romantically. When B.H. joined, Defendant took her to buy clothes and toiletries. J.A. 328. When M.J. arrived, he explained what she would be required to do, then kissed her on the mouth and took her shopping for clothes. J.A. 456–458. He would go on to "flatter[] [her] a lot," by telling her she was pretty. J.A. 486. With J.R., he promised her a relationship, told her they would probably get married, and even called her his "beautiful wife." J.A. 565. By Defendant's own admission, though, "every day [he] would build them up in the morning and break them down in the afternoon." J.A. 1263.

Defendant also exerted physical control over the victims. They had to ask him for food, hygiene items (including condoms), and transportation. J.A. 370–371, J.A. 482. He provided marijuana to them in exchange for their work, with J.R. "smoking a blunt every hour." J.A. 1272, J.A. 1308. Wallace made B.H. get a tattoo of his initials in an infinity symbol. J.A. 382–383. Defendant dictated which sex acts the victims would offer, including requiring anal sex, which he taught them and tried out with them first, requiring them to get drunk or otherwise persist if they resisted. J.A. 381, J.A. 611, J.A. 676.

Beyond that, though, Defendant was the "security" or "enforcer" of the group, which often involved "putting hands" on the victims by hitting them, punching them, choking them out, or threatening to do so. J.A. 332, J.A. 464, J.A. 558, J.A. 674, J.A. 1232. It was constant. J.A. 404. B.H. watched Defendant choke out J.R. "until her eyes rolled to the back of her head." J.A. 404. M.J. heard Defendant "beat [A.H.] and water board[] [her] baby,"

describing A.H. screaming "get off me" and the baby crying in the room next door before seeing A.H. return looking "like the elephant man" with a swollen, bruised, teary face with her son red and crying. J.A. 495–496. When A.H. called Wallace by his first name—which was "out of line in the prostitution world"—Defendant "with a backhand, with a fist[,] struck her in the face . . . and then just kept striking her in the shoulder and the chest area" as she screamed and Wallace's son looked on. J.A. 729, J.A. 1251. When B.H. broke the rules, Defendant stood over her "with his hands around her neck and bouncing" her on and off a bed. J.A. 734–736, J.A. 1269. When A.H. let her child's father into their hotel "work spot," Defendant told Wallace, "I feel like we should just kill her." J.A. 1248. Defendant even went to the home of B.H.'s most reliable client and shot at him repeatedly shortly after B.H. escaped the group. J.A. 826–835, J.A. 1330–1333.

Defendant also "spent [his] time manipulating [the victims' minds." J.A. 1264. He considered this a way to use his college psychology training rather than letting it "go to waste." J.A. 1264. He sought out young women or girls who were vulnerable to his manipulation, because "when they come in broken, you become God." J.A. 1264. To do this, he recruited "foster home kids," "running" with "absolutely no ID" or who were otherwise "abandoned, [who] didn't have anywhere to stay, that were looking to make money and needed the help." J.A. 582, J.A. 1229. Once there, many of the victims went by nicknames within the group, including Goldie, Princess, Dutchez, rather than their own identities. J.A. 342–343, J.A. 665, J.A. 1223. Indeed, the nicknames were so

pervasively used, Defendant later struggled to recall A.H.'s actual name. J.A. 1223. Defendant and Wallace would pit the victims against each other, so they were in competition. J.A. 338, J.A. 568, J.A. 765. To do this, Defendant would actively coach them in how to compete for the pimp's attention and thus undermine another prostitute's efforts to do the same. J.A. 568–569. Defendant also made it known he carried a gun—allowing it to be seen in the small of his back and getting it out on occasion, including within hours of meeting R.H., who immediately became scared of him as a result. J.A. 388, J.A. 485, J.A. 500, J.A. 657–658, J.A. 673.

Defendant also carried out schemes or told stories to further his control. One day, Defendant, Wallace, and other men were in the kitchen at Four Oaks. J.A. 677. After talking for a while, one of the men told R.H. that Defendant was going to sell her to him because she was not making enough money. J.A. 677–678. R.H. was immediately "scared because [she] didn't know where [she] was going to end up" and immediately sought Defendant's reassurance that he would not sell her. J.A. 677. On another occasion, Defendant took advantage of a blemish on Wallace's ear to craft a story and "[t]ry to get the girls to basically boost up sales and make more money, be more productive." J.A. 764–765. To do so, Defendant told the victims that, because they were not making enough money, Wallace had been kidnapped and injured by frustrated family members. J.A. 489, J.A. 764–765. The only way to get him back, said Defendant, was for the victims to bring in more money. J.A. 490–491.

Defendant and Wallace also made sure their victims were aware of their gang ties and involvement. Wallace was known to be in the Bloods street gang, which, to the victims' understanding, meant "if he wanted anything done to us [the victims] or we ever left, he could try to get us found." J.A. 573–574, J.A. 706. On one occasion, Defendant and Wallace went to what they told B.H. was a gang-related shooting after Antoine was "jumped" by rival gang members, and Defendant "came to the rescue." J.A. 388. The two later "went out to go handle the situation," and, when they returned, forced the victims to "stand outside with guns and watch the house." J.A. 388.

Defendant also claimed spiritual powers over his victims. J.A. 769. He declared he and Wallace were gods, and the prostitutes were their servants. J.A. 769. He performed rituals and ritual sex acts and told them he could read their thoughts. J.A. 396–397. Defendant said his spirit was called "Obed," a "dark entity" that "dr[o]ve him to put his hands on [them]" and to "[t]hirst for blood." J.A. 398, J.A. 770. On one notable occasion, Obed drove Defendant and Wallace to "put hands" on B.H. and J.R. J.A. 771. In that instance, Defendant and Wallace were angry because R.H. had left the group. J.A. 408, J.A. 602–605. Blaming it on the remaining victims, Defendant choked B.H. and J.R. both to the point of unconsciousness and such that J.R.'s body left the ground. J.A. 408–409, J.A. 605–606. In the driveway of the Serenity Drive house, Defendant then "began to make a circle around [B.H. and J.R.], talking in his real crazy language, which [to their understanding] was Obed possessing him." J.A. 409, J.A. 773. When he finished the circle, he told the girls that if

11

either of them stepped out of it, she would die. J.A. 409, J.A. 606, J.A. 773. He then left them there. J.A. 409, J.A. 773.

Over time, each victim except J.R. left the group. A.H. sneaked out of a hotel in the middle of the night after Defendant beat her and waterboarded her young child. J.A. 405–406. She took nothing but the "clothes on her back," uncharacteristically leaving behind mementos like a family photo and her child's ultrasound image. J.A. 407, J.A. 495–497. M.J. initially left when Defendant disregarded her request for food; she did not care about Defendant's anger or retaliation in response because, by that point, she "[g]ave up on life"—just wanting out and not caring if she lived or died. J.A. 498–499. When R.H. made known she wanted to leave, Defendant became "upset" and "frustrated" and was "ranting and raving" and telling Wallace to drop her off on the side of the road. J.A. 681–682, J.A. 752. From the look on Defendant's face, Wallace feared they would be "talking about another situation" if he did not get R.H. out, so he dropped her at a bus station with nothing. J.A. 752–753. After R.H. left, Defendant sent her "threat[ening]" text messages and posted a picture of her performing oral sex onto her social media such that other people could see, and R.H. could not take down. J.A. 683–684, J.A. 754. Finally, after Wallace beat B.H. for accidentally giving him a dirty rag with which to wash his face, she lied to Defendant and managed to escape with help from her most loyal client. J.A. 414–417. As a result, Defendant went to the client's home and shot at him. J.A. 826–835, J.A. 1330–1333. By January 2016, only J.R. remained with the group. She was attending cosmetology school, and

Defendant and Wallace were taking her financial aid money. J.A. 620, J.A. 782–783.

In mid-January 2016, local law enforcement arrested Defendant and Wallace and executed a search warrant at the Serenity Drive address. J.A. 227, J.A. 283. During the search, law enforcement found, among other items, a shotgun Defendant was carrying into the house that morning, a "private dance pole kit," the book *Pimpology*, A.H.'s family photo and ultrasound image, a shopping list of feminine hygiene products, and paperwork in Defendant's name. J.A. 244, J.A. 250, J.A. 255, J.A. 257, J.A. 259, J.A. 267–268, J.A. 886–890. Defendant was charged at the state level with four human trafficking-related counts and felon in possession of a firearm, and an attorney was appointed. J.A. 80–81.

## Defendant's Interview

After his initial appearance, Defendant asked to speak with the Assistant District Attorney (ADA) assigned to his case, without his attorney. J.A. 81. So, on January 20, 2016, ADA Kelly Sandling and Johnston County Sheriff's Office Detective Donald Pate met with Defendant in an interview room.[3] J.A. 81.

---

[3] Sandling is now an Assistant United States Attorney in the Eastern District of North Carolina. At all times relevant, though, she was a Johnston County ADA who did not represent the United States.

Pate informed Defendant of his Fifth and Sixth Amendment rights, and Defendant waived them. J.A. 81, J.A. 1428–1430. Defendant then "promise[d]" he was not going to waste Sandling and Pate's time but asked if there was any way he could tell them what he was "looking for out of what [he was] going to say" before beginning because he understood "as for talking, everything that I said will be held against me in a court of law." J.A. 81, J.A. 1431. Defendant then told them that, in exchange, he wanted all Wallace's charges dropped and that he would "eat everything" but his charges related to minors. J.A. 81, J.A. 1431. He stated, "I realized after I finish talking, I'm never going home, okay" and assured them "what I have to say will be worth what I just asked for." J.A. 82, J.A. 1431. Sandling refused to make any promises but assured Defendant she would take his statement into consideration. J.A. 82, J.A. 1432.

Jenkins escalated: "I want to trade his charges for a body." J.A. 82, J.A. 1432. Sandling then clarified, asking Defendant if he meant he wanted to discuss his pending human trafficking and firearm charges as well as information about where a body was located in exchange for Wallace's case being dismissed; he responded affirmatively. J.A. 82, J.A. 1433. Sandling told Defendant she could not make that promise. J.A. 82, J.A. 1433. Defendant told them he was "not going to say too much right now until we get somewhere" but that his information "can be verified" and it would "be a Pyrrhic victory if I just talked and nothing is confirmed." J.A. 82, J.A. 1436. He assured them he

was "willing to tell you anything you want to know in its full detail." J.A. 82, J.A. 1436.

After Sandling reiterated that she could not make any promises, Defendant proposed that he would take his charges if Wallace were given only "the weed charges and the stolen gun charge" and could "go home." J.A. 82, J.A. 1437, 1439. As an offer of proof about the body, Defendant provided the victim's name and asked, "where do we go from here?" J.A. 82–83, J.A. 1441. Sandling and Pate stepped out of the room. J.A. 83, J.A. 1441.

When they returned, Sandling told Defendant she had spoken with the District Attorney. J.A. 83, J.A. 1442. She summarized Defendant's offer as "you wanted to take most of the charges in exchange for providing information on our cases, the sex cases, human trafficking case that you're charged with and the firearm by felon in exchange for giving Antoine Wallace some consideration" in the form of "not be proceeding on the sex charges" against him and "offering him probation."[4] J.A. 83, J.A. 1442–1443. Defendant responded, "Let's talk then." J.A. 83, J.A. 1443. Sandling said "Okay" and clarified that she was not making any promises on the murder case because she did not know what Defendant would say, to which he said "[o]kay." J.A. 83, J.A. 1443.

---

[4] The state charges against Wallace were eventually reinstated—and he was subsequently charged at the federal level—because Jenkins breached his plea agreement by not pleading guilty to any offenses. J.A. 63, n. 6.

Jenkins then attempted to reopen negotiations, asking not to receive the death penalty and to serve his time in the state system. J.A. 83, J.A. 1445. Sandling replied that was "a new addition," and she could not make any promises. J.A. 83, J.A. 1445. Jenkins eventually recognized "this conversation only proceeds on behalf of my nephew, Antoine Wallace. That's the only reason I'm here with you . . . ." J.A. 84, J.A. 1447–1448. Sandling and Pate then clarified that whether to take the offered plea would be "Antoine's decision," and Defendant acknowledged that if he refused, "That's on him." J.A. 84, J.A. 1448–1449. In that case, they told Defendant, Wallace would be tried for trafficking, and Jenkins clarified "[f]or everything." J.A. 84, J.A. 1449. Having clarified, Defendant stated, "Let's go" and asked if they needed a recorder. J.A. 84, J.A. 1449.

Jenkins then re-expressed his concern with his charges related to minors but stated, "but at the same time, we're going to talk right?" J.A. 1450–1451; *see also* J.A. 84. He clarified, "All the deals and everything is [sic] on the table?" and that they were "[j]ust waiting on Antoine to take care of?" J.A. 84, J.A. 1451. Sandling agreed that was correct from Defendant's end, but she did not know what Wallace's position was, as she had not spoken with him. J.A. 84, J.A. 1451. They discussed how Defendant wanted it known that Wallace was "not a snitch." J.A. 84, J.A. 1452. Defendant asked if there would be other charges from his statements, and Sandling replied "if other people are involved possibly, yes." J.A. 84, J.A. 1454.

Pate and Sandling then reiterated that Defendant was there to talk about "the [human trafficking] organization and what happened," and, for the next two hours, Defendant did. J.A. 84–85, J.A. 1222–1361. At the end, Pate went over his notes with Defendant, who made corrections and then signed the document. J.A. 85, J.A. 1340–1361. After discussing next steps, Defendant told Sandling and Pate to tell his lawyer, "I'm the dumbest client he's ever had in his life. I've let my heart take over my mind." J.A. 85–86.

## Federal Case and Pretrial Motions

Defendant was indicted federally in November 2018. J.A. 29–34. Through counsel, he filed two pretrial motions pertinent to this appeal.

*Motion in Limine to Exclude Defendant's Recorded Confession*

First, Defendant moved in limine to suppress "plea discussion statements." J.A. 35. Defendant argued his confession occurred during plea negotiations and was inadmissible under Federal Rule of Evidence 410. J.A. 43. The government opposed, arguing "[b]y the time the defendant confessed to human trafficking, plea negotiations were over. The parties had reached a plea agreement that required the defendant to provide an admissible confession, and he did." J.A. 53.

The district court denied Defendant's motion. J.A. 80–100. In its order, the district court said its inquiry "focus[ed] on whether Jenkins's human trafficking confession constitutes inadmissible plea negotiations," which required assessing "whether the accused exhibited an actual subjective expectation to

negotiate a plea at the time of the discussion, and, second, whether the accused's expectation was reasonable given the totality of the objective circumstances." J.A. 90–91 (quoting *United States v. Robertson*, 582 F.2d 1356, 1366 (5th Cir. 1978) (en banc)).

The district court found that the interaction between Defendant, Sandling, and Pate began as plea negotiations. J.A. 92. Critically, it found Defendant "understood the difference between protected plea negotiations and an admissible confession," as seen by such statements as "once I start talking, everything that I said will be held against me in a court of law." J.A. 93. The court held Defendant "insisted on a plea agreement before making a statement"—that he "wanted to negotiate a plea agreement before confessing, and he did." J.A. 93. It summarized the mutually-agreed-upon plea terms as follows:

> (1) Jenkins would plead guilty to some of the human trafficking charges and the firearms charge, (2) Jenkins would provide information about those charges, and (3) Jenkins would provide information about the Elton Whitfield homicide. In exchange, the state promised: (1) to dismiss all human trafficking charges against Antoine Wallace, while leaving the marijuana charge and stolen gun charge pending, (2) to offer Wallace probation for the marijuana and stolen gun charge, and (3) to consider Jenkins's truthful statement about the Elton Whitfield homicide.

J.A. 93–94. The district court found that the parties' conduct bolstered its finding that they had reached a plea agreement because he confessed "[i]mmediately after negotiations ended." J.A. 94.

The court also found that Defendant "understood that his confession would be admissible" because of numerous statements, including:

- "[E]verything I said will be held against me in a court of law."

- "I realized after I finish talking, I'm never going home, okay."

- "[T]ell [my lawyer] that I'm the dumbest client he's ever had in his life."

 J.A. 96.

The court found that later—*after* confessing to human trafficking and the Whitfield murder—Defendant, Sandling, and Pate opened a second, separate plea negotiation concerning other murders that ultimately did not come to fruition. J.A. 96–98.

The district court found that Defendant "subjectively knew that his confession to human trafficking was not part of one continuous plea negotiation[]," as his "words and actions prove that he insisted on reaching a plea agreement before providing a confession to human trafficking." J.A. 97. It further found Defendant "understood the terms of the deal, and he knew that the entire point of his confession was to give the state a usable statement to ensure a conviction." J.A. 97.

As to the second prong of its inquiry, the district court found "even if Jenkins did not subjectively understand that his human-trafficking confession was admissible, [his] expectation was not reasonable," as Sandling and Pate

"explained that the confession could be introduced in court" and "made that clear when they reached a plea agreement and insisted that a confession was part of the agreement." J.A. 97. The district court also found that they rejected Defendant's "efforts to add new terms to the plea agreement just before the confession began" and, once it began, "they conducted a debrief and did not reopen negotiations." J.A. 97. The court found that Defendant and the state had an oral plea agreement of which a "key term of the agreement was Jenkins's immediate cooperation, and Jenkins performed as agreed." J.A. 98. Therefore, because Defendant was not negotiating a plea when he confessed to human trafficking, the district court concluded Rule 410 did not bar admission of his human trafficking confession. J.A. 98.

Ultimately, the district court held that Defendant "voluntarily and knowingly negotiated a plea agreement" that he would exchange "an admissible confession to human trafficking" and the designated homicide for "leniency toward his nephew Antoine Wallace." J.A. 98, J.A. 100. Accordingly, when he confessed, "he subjectively understood that his statements were not protected," and "[e]very comment Jenkins made and every action he took confirm this understanding." J.A. 100. For all these reasons, the court ruled the confession admissible.

*Motion in Limine to Exclude Government Expert*

Defendant also moved in limine to exclude the government's proposed expert witness, Dr. Sharon Cooper—a forensic and developmental behavioral

pediatrician—under Federal Rules of Evidence 702, 403, and 704.[5] J.A. 101, J.A. 108. As to Rule 702, Defendant argued Dr. Cooper's testimony would be inappropriate because it had "not been applied to the facts of this case" and would be cumulative. J.A. 103. As to Rule 403, Defendant argued the probative value of Dr. Cooper's testimony would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, and needless presentation of cumulative evidence because she would testify only to "generalities" rather than the specific facts of Defendant's case. J.A. 104.

The government responded in opposition, arguing that expert testimony explaining sex trafficking and child sexual exploitation would help the jury understand the dynamics of the case and noting that "numerous circuits have affirmed admitting expert testimony to explain pimping and sex trafficking to juries" and that many Courts, including this one, "routinely allow expert testimony explaining the methodology and terminology of other criminal enterprises." J.A. 110–113. The government also refuted the argument that Dr. Cooper's testimony would be *unfairly* prejudicial. J.A. 113.

The district court denied the motion, holding that "the testimony helping to explain sex trafficking and child sexual exploitation will help the jury understand the dynamics of the case" particularly as to "potentially confusing dy-

---

[5] Defendant does not persist in his argument under Rule 704. *See* Brief at 41–53.

namics outside the normal knowledge of a lay juror." J.A. 120. The district court explained that it had conducted Rule 403's balancing test and that the testimony would be admissible. J.A. 121.

## Trial

At trial, the government called witnesses to establish the facts described above, among many others not at issue in the instant appeal. Government witnesses included local and federal law enforcement officers, victims B.H., M.J., J.R., and R.H., B.H.'s client the shooting victim, co-defendant turned cooperator Antoine Wallace, and expert Dr. Sharon Cooper.

Dr. Cooper was qualified and permitted to testify as an expert in developmental, behavioral, and forensic pediatrics. J.A. 908–918. She explained to the jury the difference between prostitution and trafficking: that prostitution was an exchange between two consenting adults of sex for something of value, but trafficking occurred when third-party control was involved. J.A. 919. She explained her role at trial was "to provide education to the jury and/or the judge because this is a form of victimization that many people do not fully understand," rather than to testify about the specific facts of the case. J.A. 920–921.

Dr. Cooper began by summarizing several different types of pimps, including pimps who used love and romance to groom, pimps who used violence or force to control (these first two being the most common), pimps who used wealth to convince victims they are safe, pimps who supplied drugs to main-

tain control, and those who kept victims in "debt bondage" by owing money. J.A. 921–922. She explained that the violent pimp "often will vacillate between you're doing a really good job; you're making plenty of money, and/or you didn't make enough money and so they will frequently beat the victim up" to rule the victim by fear. J.A. 922–923. On the other hand, the romantic pimp will "sell[] the victim a dream" of having "a life ever after" but that first they have to get money, "[b]ut the problem is that the money is never the victim's." J.A. 923.

She explained that pimps often fulfill multiple roles in the victim's lives, including as the father who provides "food, clothing and shelter" and often requires being called "daddy," but in fact acts as an abusive or incestuous father. J.A. 923–924. Pimps also often fill the role of a boyfriend or a husband to multiple women or girls who then must compete "to try to be the one that [the] pimp is going to love the most." J.A. 924–925. Finally, pimps often fill the role of spiritual manipulator in a victim's life. J.A. 925.

Dr. Cooper told the jury pimps usually did not use their true given names, instead preferring "superlative names" to give "the victim the impression that this is a person they really ought to almost worship." J.A. 926. Similarly, when pimps got control of new victims, "[t]hey often will change the name right away of that victim" so that the victim will believe she is in a new life. J.A. 926–927.

Dr. Cooper spoke about common risk factors for victims of sex trafficking and that often victims had endured multiple forms of abuse. J.A. 928–937.

She explained that common risk factors included: being undereducated, impoverished, a runaway, a minor, involved in criminality or gangs, or a victim of prior sexual abuse. J.A. 928–937. She told the jury these risk factors were actively targeted by traffickers. J.A. 937–938.

Dr. Cooper explained that there were common recruitment tactics used by traffickers. Often, they would approach victims romantically and "be very nice to them and sometimes shower them with gifts" at first but then run out of money and tell the victim "together we can make it. You just need to do your part." J.A. 938. She explained that online recruitment was common and could occur from the trafficker or other victims. J.A. 939.

Once recruited, Dr. Cooper explained that victims were often part of a process known as "grooming" wherein the victim is convinced they will "have a good life together" and "make money." J.A. 940. This process also often included an early sexual assault of the victim "to show that the trafficker has the power and control in the situation." J.A. 940. Violence toward or witnessed by the victim was also a common grooming tactic, so the victim would "recognize . . . I better tow the line." J.A. 941.

Once a victim was recruited, Dr. Cooper explained that "these traffickers' goal is to exert power and control over the victims," which would be done by several methods. J.A. 941. She testified that "professions of love" was a very common, "highly manipulative strategy" to make victims "become very compliant" and build loyalty that could last even after their rescue. J.A. 941–942. Dr. Cooper also explained that traffickers would often stoke a "competitive na-

ture" among the victims to cause them to work harder to make more money. J.A. 942–943. She told the jury that beating or choking victims to intimidate them and other victims was another method of control. J.A. 943. She explained that this created a trauma bond between victim and abuser. J.A. 944–945. She explained often a trafficker would strangle a victim to "remind[] them that they have their life in their hand basically and then they let go and the victim falls to the floor, then the victim becomes very grateful that this person has let them live." J.A. 945. She explained traffickers will often have victims tattooed with a particular tattoo to "show[] ownership on the part of that offender." J.A. 946. Dr. Cooper told the jury that this control by the trafficker "often can exist outside of face-to-face contact," including through digital communication. J.A. 946–947.

Dr. Cooper told to the jury why, despite all this maltreatment, victims do not leave the trafficker. She explained, "[T]hey believe what the trafficker has been telling them": "that they're no good for other things than for what they are being put out in the streets to do." J.A. 947. She also told the jury that threats of harm to the victims or people they know also prevent their leaving. J.A. 947–948. Further, she noted that victims did not always see themselves as victims but sometimes as partners "because money is coming in," though they do not control it. J.A. 948.

Dr. Cooper also explained dynamics related to victimhood, including that victims commonly do not understand the danger they have faced and "can speak of highly traumatic experiences in a very flat affect as if it had not really

affected them." J.A. 949. She explained that this could be misleading because it was the result of being "traumatized over and over and over again," rather than exaggeration. J.A. 949.

Dr. Cooper explained to the jury that victims of sex trafficking were often distrustful of law enforcement because that is what they have been taught by the trafficker or because they are protective of him. J.A. 950. To the end, she explained to the jury it was common for a trafficker to specifically instruct the victims how to interact with law enforcement. J.A. 951.

The testimony then shifted to "[a]busive images" taken by traffickers of their victims. J.A. 951. Dr. Cooper explained that "it is the rule more so than the exception that there's going to be some kind of digital data on a given victim, and often it will be very compromising in nature, and so it is another effort of power, control and, frankly, humiliation for a victim." J.A. 951–952. She told the jury "[t]hese images are life changing for victims because they cause extreme guilt, self blame and shame" that serve as a "deterrent for a victim to seek help" and "make victims feel that they are never going to be safe." J.A. 952–953. Particularly if these photos involve "posing and performing," they could also cause victims to "feel much more anxiety and depression because they feel that no one is ever going to believe them that this was not their idea." J.A. 953.

Finally, Dr. Cooper explained about the enduring medical impacts of being trafficked, including untreated traumatic brain injury and injury associated with strangulation, dependence on drugs brought about by trying to cope, gy-

necological ramifications to include physical complications and infectious disease, and the psychological impact, including most commonly PTSD, depression, and anxiety. J.A. 954–955. She explained that these impacts can be lifelong. J.A. 955. Defendant did not object to any specific testimony by Dr. Cooper. J.A. 955.

Before resting, the government played the two-hour, human trafficking confession portion of Defendant's interview. J.A. 994, J.A. 1222–1361. Defendant then put on his case in chief, calling a private investigator and several law enforcement witnesses. The jury returned a verdict of guilty on all counts. J.A. 1196, J.A. 1211, J.A. 1362–1366.

## Presentence Investigation Report

As calculated in the Presentence Investigation Report (PSR), Defendant's base offense level was 34, to which enhancements were added for leadership, influencing a minor, use of a computer, commission of a sex act, use of a firearm in connection with another felony offense, and being a repeat offender against minors. J.A. 1469–1472, ¶¶ 66–110. When adjusted for the multiple counts, Defendant's offense level was a 51, though, because it was one of "those rare instances where the total offense level is calculated in excess of 43," it was "treated as a level 43." His guidelines range was life. J.A. 1472, ¶¶ 110–114.

Defendant filed numerous written objections, including disputing the offense conduct and sentencing enhancements. J.A. 1477–1482.

## Sentencing Hearing

At the sentencing hearing, Defendant did not add anything to his written objections. J.A. 1371. The district court ruled, denying (or finding moot) each of Defendant's objections and leaving his guidelines range as life. J.A. 1371–1380.

Defense counsel's sentencing argument focused on Defendant's history and characteristics. J.A. 1385. It specifically discussed abuse in his childhood home and that, nevertheless, Defendant graduated high school and went to college, playing football there and briefly in the NFL. J.A. 1385. Counsel also mentioned Defendant's prior prison sentence and that he was trying to do electrical work following his release. J.A. 1385. For these reasons, he requested a sentence of 210 months—the bottom of the guidelines range he calculated if all his objections had been sustained. J.A. 1380, J.A. 1385–1386. In response, the district court asked why. J.A. 1386. Defense counsel again noted abuse in the home and Defendant's education as well as trying to "get away from that kind of life [of crime]." J.A. 1386. The district court asked when Defendant tried to get away, and defense counsel replied when he went to college. J.A. 1386. The district court confirmed that the attempt to get away went that far back, and defense counsel agreed, saying those were the ultimate points for a sentence below 210 months. J.A. 1386.

Defendant opted not to allocute, noting that he was "not admitting any type of guilt." J.A. 1387.

The government then argued that, in her experience as the human trafficking prosecutor in the district, Defendant was not a typical human trafficker, but a "sociopath first," for whom sex trafficking young women and girls "was a new way to inflict pain on other human beings for his pleasure." J.A. 1388–1389. She argued that Defendant *could* have gotten out, via college or football, but he did not want to; instead, he "would rather hurt other human beings, and he couldn't walk away from that." J.A. 1390–1391. She reiterated key categories of testimony from trial, including "[t]he physical violence, the sexual violence," and "[t]he psychological torture." J.A. 1391–1393. The government noted it was "hard to catalog here all of the ways that this defendant inflicted every form of violence, torture and misery" and requested that, seeing as Defendant "blew the top off the guidelines," the district court "impose the only sentence that will protect the community, which is life in prison." J.A. 1392–1393.

The district court then explained and pronounced its sentence. It noted that it had considered arguments from defense counsel, Defendant's statement, the government's arguments, the advisory guidelines range, and the required statutory factors. J.A. 1394–1395. The court summarized the counts of conviction and observed it was "hard to capture how horrific the behavior was." J.A. 1395. Nevertheless, it noted key components of the trial evidence including recruiting vulnerable victims and requiring them to engage in intercourse with him "as part of their psychological subservience." J.A. 1396. The court recalled Dr. Cooper's explanation of the psychological coercion and how it was

reflected in Defendant's confession. J.A. 1396. It observed that Defendant's actions "really [are] a form of modern-day human slavery" and that he did all of this "as part of this horrific criminal behavior to control all aspects of [the victims'] lives, to force them to engage in anal intercourse and other forms of sexual conduct that they didn't want to engage in, to be beaten, to be threatened, to be intimidated." J.A. 1396. It also recalled Defendant shooting at B.H.'s client after she escaped. J.A. 1396–1397.

The court discussed Defendant's history and characteristics, noting defense counsel's arguments and explicitly rejecting the notion that abuse in the childhood home and attempting to overcome it by going to college and playing football warranted a downward variance because "[a]ll of those events took place when you were in your twenties" and all the conduct underlying his present convictions "took place after [he] had served a serious sentence in state prison for second degree murder and got out and was committed to a criminal lifestyle that short of murdering the women, incredibly harmed them and abused them repeatedly." J.A. 1397–1398.

The court noted "protecting the public is absolutely critical in this case" as "the trial record certainly suggested that [Defendant] derived pleasure from imposing pain on these women." J.A. 1398. It emphasized the need to deter others who may think engaging in human trafficking was a good idea. J.A. 1398. For these and other reasons, the district court sentenced Defendant to guidelines sentences of life on each of the three counts where applicable, to be

served consecutively, and the statutory maximums on the others, to be served concurrently. J.A. 1398–1399, J.A. 1418.

# SUMMARY OF ARGUMENT

1. The district court did not err in denying Defendant's motion to suppress and permitting his confession at trial. The court was correct in finding that Defendant and the state prosecutor engaged in plea negotiations that contemplated this very outcome, and both performed as agreed. Defendant's subjective understanding that he was providing an admissible confession as a result of—not during—plea negotiations is clear from statements he made at the time, as well as the fact that he then provided an exhaustive confession. For these reasons, the district court also did not clearly err in finding any other understanding would be objectively unreasonable.

2. The district court did not err in admitting expert testimony from a physician who specializes in sex trafficking and its unique dynamics. This information is not intuitive and was helpful to the jury. Accordingly, its probative value was significant and certainly not outweighed by any undue prejudice.

3. Finally, Defendant's within-guidelines sentence was reasonable. Procedurally, Defendant made limited arguments in mitigation, but they were acknowledged and considered by the district court. Substantively, the district court imposed a within-guidelines sentence that is presumed reasonable and thoroughly justified its imposition by relevant sentencing factors, including the "horrific" nature of the offense and Defendant's violent background.

# ARGUMENT

## I. Defendant provided a confession pursuant to completed plea negotiations, and it was properly admitted at trial, as all involved parties understood it would be.

### A. Standard of Review.

In reviewing the denial of a motion to suppress, this Court "review[s] legal conclusions de novo and factual findings for clear error." *United States v. Pulley*, 987 F.3d 370, 376 (4th Cir. 2021). A district court's admission of evidence is reviewed for abuse of discretion. *United States v. Lighty*, 616 F.3d 321, 351 (4th Cir. 2010).

### B. Discussion of Issue.

Defendant engaged in plea negotiations with the state prosecutor and, pursuant to them, provided a confession that he expected to be used against him in court.

The central question is whether the district court clearly erred when it found Defendant's confession to sex trafficking came after plea negotiations with the state prosecutor, rather than during. Statements made *during* plea negotiations are protected from admission against the defendant, while debriefs pursuant to completed plea negotiations are not. *See* Fed. R. Evid. 410(a)(4).

Rule 410 is to be construed narrowly. *United States v. Stevens*, 455 F. App'x 343, 345 (4th Cir. 2011) (unpublished). To make its assessment, courts assess "whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused's

expectation was reasonable given the totality of the objective circumstances." *United States v. Robertson*, 582 F.2d 1356, 1366 (5th Cir. 1978) (en banc); *United States v. Cowan*, Nos. 95-5508, 95-5509, 1996 WL 521049, at *5 (4th Cir. Sept. 16, 1996) (unpublished). Statements voluntarily made "after a plea agreement has been reached cannot be considered statements made 'in the course of plea discussions' within the meaning of the exclusionary rule[]." *United States v. Hare*, 49 F.3d 447, 450 (8th Cir. 1995); *United States v. Watkins*, 85 F.3d 498, 500 (10th Cir. 1996) (collecting cases); *United States v. Marks*, 209 F.3d 577, 582 (6th Cir. 2000); *United States v. Burch*, 156 F.3d 1315, 1320 n.4 (D.C. Cir. 1998); *United States v. Knight*, 867 F.2d 1285, 1288 (11th Cir. 1989); *see also Hutto v. Ross*, 429 U.S. 28, 30–31 (1976) (per curiam).

Here, the district court made findings of fact that were well-supported by the record concerning Defendant's subjective belief that his statements were pursuant to plea negotiations and would, thus, be admissible against him, as well as the objective reasonableness of that belief given the facts of the case. J.A. 80–88, J.A. 92–97.

The interaction began with Defendant being advised of his Fifth and Sixth Amendment rights, including that his statements could be used against him in court. J.A. 1427–1430. Defendant and the state prosecutor (accompanied by a county detective) then engaged in plea negotiations. J.A. 1431–1454. These negotiations involved some back-and-forth but ultimately arrived at the following:

- Defendant would:

  o Plead guilty to the human trafficking charges (not in-volving a minor) and the firearm charge,

  o Provide information about those charges, and

  o Provide information about the designated homicide.

- Prosecution would:

  o Dismiss all human trafficking charges against Antoine Wallace, leaving the marijuana and firearm charge in place,

  o Offer Wallace probation for those charges, and

  o Consider Defendant's information about the murder.

J.A. 93–94. Having reached these conclusions, Defendant did exactly what the terms of the agreement contemplated: thoroughly confessed to human trafficking. J.A. 1222–1361. His performance is itself compelling evidence of his understanding of the negotiations. J.A. 85; *Cf. Gurney Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 467 F.2d 588, 594 (4th Cir. 1972) (explaining that contract law considers the parties' performance strong evidence of their understanding of the agreement); *accord* Richard A. Lord, "Practical Interpretation or Construction," 11 *Williston on Contracts* § 32:14 (4th ed. 2020).

The district court properly found as a matter of fact that, on several occasions, Defendant articulated his subjective understanding that the ensuing confession would be used against him. While negotiating, he stated, "I understand that once I start talking, everything that I said will be held against me in

a court of law." J.A. 81, J.A. 93, J.A. 95. Further he stated, "I realized after I finish talking, I'm never going home, okay." J.A. 82, J.A. 93, J.A. 96. Before the terms had been ironed out, Defendant told Sandling and Pate he was "not going to say too much right now until we get somewhere," revealing his understanding that, if he later confessed, it was because they *had* gotten somewhere with a plea deal. J.A. 82, J.A. 93. After Defendant's thorough confession, he encouraged Sandling and Pate to tell his attorney "I'm the dumbest client he's ever had in his life." J.A. 85–86, J.A. 96. There would be no reason to say that if he did not understand that the confession he had just provided would be admissible against him. For all these reasons, the district court found as a matter of fact "Jenkins understood the difference between a protected plea negotiation and an admissible confession. [He] wanted to negotiate a plea agreement before confessing, and he did," and he "subjectively knew that his confession to human trafficking was not part of one continuous plea negotiation[]." J.A. 93, J.A. 97. The district court did not clearly err in so finding.

Given the above, the district court was also correct in its alternative finding that, even if Defendant did not "subjectively understand that his human-trafficking confession was admissible, [his] expectation was not reasonable." J.A. 97. In support, the district court found "Sandling and Detective Pate repeatedly explained that the confession could be introduced in court," as when they *Mirandized* him before any negotiations took place. J.A. 97, J.A. 1428. The court was correct when it found "[t]hey made that clear when they reached a plea agreement and insisted that a confession was part of the plea agreement,"

as seen when Sandling summarized the terms of the agreement for Defendant. J.A. 97, J.A. 1442–1445. It was also correct when it found "they rejected Jenkins's efforts to add new terms to the plea agreement just before the confession began," as seen when he tried to negotiate where he would serve his sentence and whether he would get the death penalty, and Sandling responded "[w]ell that's a new addition and…I can't make any promises." J.A. 97, J.A. 1445. And it was correct when it found that "[o]nce the confession began, they conducted a debrief and did not reopen negotiations." J.A. 97, J.A 1222–1361.

For all these reasons, the district court properly found that Defendant's confession was pursuant to completed plea negotiations, not a part of them. As he did with the district court, Defendant is now asking this Court "to revise history." J.A. 100. It, too, should decline the invitation.

## II.   Dr. Cooper was properly admitted as an expert, and because her testimony aided the jury's understanding of human trafficking, it did not run afoul of Rule 403.

### A.   Standard of Review.

This Court reviews for abuse of discretion the district court's decision to admit expert testimony under Federal Rule of Evidence 702. *United States v. Wilson*, 484 F.3d 267, 273 (4th Cir. 2007). This deferential standard "grants the district judge the discretionary authority . . . to determine reliability in light of the particular facts and circumstances of the particular case." *Id.*

When considering whether a district court erred in failing to exclude testimony under Federal Rule of Evidence 403, this Court "appl[ies] a highly def-

erential standard of review," and "a trial court's decision to admit evidence over a Rule 403 objection will not be overturned except under the most extraordinary circumstances, where that discretion has been plainly abused." *United States v. Hassan*, 742 F.3d 104, 132 (4th Cir. 2014) (internal quotation marks omitted).

Where a party does not object at the time, issues raised on appeal are reviewed for plain error, which requires that the defendant establish an error, that was plain, and that affected his substantial rights. *Greer v. United States*, 141 S. Ct. 2090, 2096–97 (2021). Even still, this Court need not reverse unless it also finds the error had a serious effect on the fairness, integrity, or public reputation of judicial proceedings. *Id.*

## B. Discussion of Issue.

Dr. Cooper's testimony was properly admitted at trial, as it aided the jury in understanding the dynamics of human trafficking and did not run afoul of Rule 403.

### 1. The district court properly admitted Dr. Cooper as an expert witness.

Federal Rule of Evidence 702 permits expert testimony if the witness's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "Rule 702 is broadly interpreted, and helpfulness to the trier of fact is its touchstone. Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday

knowledge and experience of a lay juror." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) (internal citation and quotation marks omitted).

The culture and dynamics of sex trafficking are "not the subject of common knowledge." *United States v. Taylor*, 239 F.3d 994, 998 (9th Cir. 2001). Sometimes "coercion and force may be subtle," and sometimes they may look like "rape, beatings, [and] death threats." *United States v. Carson*, 870 F.3d 584, 591 (7th Cir. 2017). Further, because traffickers prey on victims who "believe they have nowhere to go" and are otherwise vulnerable, uneducated juries could be confused as to why they stay or even seem affectionate toward a defendant. *Id.* For these reasons, "broad[]" expert testimony about the typical "human trafficking experiences of its victims and the common behaviors of traffickers" helps "give context to the victim's testimony." *United States v. Warren*, 774 F. App'x 778, 782 (4th Cir. 2019) (unpublished). Such testimony "aid[s] the jury in better understanding some of the concepts and events described by the victim and in assessing the victim's credibility." *Id.* Without it, "the jury would have no way of determining whether the victim's experiences were common, unique, or implausible." *Id.* This testimony "on pimping patterns and the pimp-prostitute relationship" can "shed light on critical issues" and "help[] the jury to determine the credibility of the government's prostitute-witnesses" especially where cross-examination suggests that they are lying, they acted "voluntarily," or the defendant was not their pimp. *United States v. Anderson*, 851 F.2d 384, 392–93 (D.C. Cir. 1988).

Unsurprisingly, numerous circuits—including this one—have affirmed use of experts—including Dr. Cooper, specifically—to explain pimping and sex trafficking to juries. *E.g., United States v. Marshall*, 946 F.3d 591, 596-97 (D.C. Cir. 2020) (noting Dr. Cooper's extraordinary qualifications and holding that counsel was not ineffective by only partially challenging her testimony); *United States v. Carson*, 870 F.3d 584, 590–91 (7th Cir. 2017) (describing how Dr. Cooper helped the court and the jury understand sex trafficking); *see also, e.g., United States v. Warren*, 774 F. App'x 778, 782 (4th Cir. 2019) (unpublished) (finding "no abuse of discretion in the district court's allowing [an expert witness] to testify broadly about the typical human trafficking experiences of its victims and the common behaviors of traffickers"); *United States v. Geddes*, 844 F.3d 983, 991 (8th Cir. 2017); *United States v. Bryant*, 654 F. App'x 807, 813–14 (6th Cir. 2016) (unpublished); *United States v. Hornbuckle*, 784 F.3d 549, 555 (9th Cir. 2015); *United States v. Brinson*, 772 F.3d 1314, 1319 (10th Cir. 2014); *United States v. Williams*, 116 F. App'x 890, 891–92 (9th Cir. 2004) (unpublished); *Taylor*, 239 F.3d at 998; *Anderson*, 851 F.2d at 392–93. Indeed, in an unpublished opinion last year, this Court affirmed the district court's decision to permit Dr. Cooper's testimony in a sex trafficking case, noting "the weight of authority supports [this] position" and citing numerous cases "in which courts have upheld the admission of expert testimony on the culture of sex trafficking and the psychology behind it." *United States v. Jennings*, 860 F. App'x 287, 288–89 (4th Cir. 2021) (unpublished).

Here, the district court did not abuse its discretion in permitting precisely this type of testimony. The court joined many before it in ruling that expert "testimony helping to explain sex trafficking and child sexual exploitation will help the jury understand the dynamics of the case" and "help to explain potentially confusing dynamics outside the normal knowledge of a lay juror." J.A. 120. And Dr. Cooper's testimony did exactly that, explaining unique facets of sex trafficking, such as:

- commonly-used terminology and nicknames J.A. 920, J.A. 926,

- types of pimps, including romantic, violent, and drug supplier J.A. 921,

- roles of the pimp, including father, boyfriend, spiritual manipulator J.A. 923,

- risk factors for victimhood, including abuse, poverty, running away, lack of stable home life, and criminality J.A. 928–936,

- recruitment tactics, including romance, deception, and the internet J.A. 938–939,

- methods of control, including love, violence leading to trauma bonding, and building competition among victims J.A. 941–944,

- why victims do not leave even when physically apart from trafficker J.A. 942, J.A. 946–948,

- why victims may seem unemotional about their experiences J.A. 949,

- how taking explicit photos contributes to trafficker control J.A. 951, and

- how long the impact of victimhood can endure J.A. 954–955.

Because these issues are beyond the ken of the typical lay juror, the district court did not abuse its discretion by permitting Dr. Cooper's expert testimony to aid the jury's understanding of evidence in the case, including testimony from the victims and Wallace, as well as Defendant's confession.

## 2. Dr. Cooper's testimony did not run afoul of Rule 403.

Dr. Cooper's testimony was not unfairly prejudicial. Federal Rule of Evidence 403 permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of … unfair prejudice[ and] confusing the issues." Fed. R. Evid. 403; *see also* Brief at 41, 52. Relevant evidence is that which "has any tendency to make a fact [of consequence] more or less probable."[6] Fed. R. Evid. 401. Simply because evidence prejudices the opposing side is not a basis for exclusion under Rule 403; indeed, almost any relevant evidence *will* prejudice the party opponent. *See United States v. Mohr*, 318 F.3d 613, 619–20 (4th Cir. 2003) ("our adversarial system depends on opposing parties offering evidence that will strengthen their respective positions and damage

---

[6] To the extent Defendant now makes a relevance or scope argument regarding Dr. Cooper's testimony, he is under plain error review, as he did not object to either below. J.A. 101–106.

that of their opponents"). For this reason, "[i]t is worth remembering that the touchstone for excluding evidence under Rule 403 is not prejudice, but 'unfair' prejudice. Moreover, unfair prejudice must 'substantially' outweigh the probative value of the evidence." *United States v. Grimmond*, 137 F.3d 823, 833 (4th Cir. 1998). Given the fact-intensive nature of a Rule 403 determination, "a trial court's decision to admit evidence over a Rule 403 objection will not be overturned except under the most extraordinary circumstances, where that discretion has been plainly abused." *United States v. Hassan*, 742 F.3d 104, 132 (4th Cir. 2014) (internal quotation marks omitted).

Here, the district court performed Rule 403's balancing test and decided it favored admitting Dr. Cooper's testimony. J.A. 121. This decision did not run afoul of Rule 403 at all, much less to the extent that the court plainly abused its discretion. *See Hassan*, 742 F.3d at 132. Though of course her testimony may have been prejudicial to Defendant—and indeed, it properly should have been—it was not unfairly so. *See Mohr*, 318 F.3d at 619. It was also illuminating, rather than confusing, for the jury's consideration of the issues.

Defendant now claims Dr. Cooper's testimony was unduly prejudicial because she discussed facts or dynamics about sex trafficking that were not present in his case. The record is clear that Defendant is incorrect: the matters Dr. Cooper discussed were present in this case and, to the extent any were not, they were certainly not so egregious as to fail Rule 403's balancing test.

Defendant claims Dr. Cooper discussed several ways pimps recruited and controlled victims that were not present in this case, including gang in-

volvement, wealth, and supplying drugs. In fact, the record showed Defendant or Wallace employed each of these tactics at one point or another. Wallace was an active gang member, and Defendant was involved in gang violence. J.A. 388, J.A. 1280–1281. When victims first joined the group, Defendant or Wallace would often take them shopping for clothes and necessities. J.A. 557–558, J.A. 1254. And Defendant provided alcohol and marijuana to the victims as needed to continue obeying orders. J.A. 381–82, J.A. 669, J.A. 1308.

Defendant claims Dr. Cooper's discussion of victims of the same trafficker seeing themselves as "wife-in-laws" "had nothing to do with the facts of this case," but ignores that Dr. Cooper discussed this in the context of ways traffickers encourage competition among their victims. Brief at 45; J.A. 924–925. Defendant's deliberate stoking of competition among his victims was a commonly-acknowledged dynamic in the case. J.A. 338, J.A. 568, J.A. 765.

Defendant claims Dr. Cooper's discussion of how pimps would change victims' names "so the victim believes that they are in a new life" was improper because the facts of the case showed women only used pseudonyms to advertise on Backpage. Brief at 46; J.A. 926. In fact, even in their testimony, the girls often referred to fellow victims by the nicknames, and the nicknames were clearly used so pervasively that Defendant struggled to remember A.H.'s (aka Goldie) actual name. J.A. 1223.

Defendant claims Dr. Cooper's discussion of the extent of child sexual abuse that makes one vulnerable to being trafficked was "unrelated" to the facts of this case. Brief at 47; J.A. 937–937. In fact, all but one of the testifying

victims told the jury that they had experienced sexual abuse in their youth. J.A. 448, J.A. 531, J.A. 652–653.

Defendant claims Dr. Cooper's discussion of enduring loyalty to the pimp after escape was not present in this case because the victims here left of their own volition and "for better opportunities." Brief at 47, 49; J.A. 942. In fact, A.H. escaped in the dead of night, B.H. escaped via a client whom Defendant then shot at as a result, M.J. was only allowed to leave when she reached the point that the did not care if she lived or died, and R.H. was driven away by Wallace because he feared what Defendant might do if she stayed. J.A. 406, J.A. 417, J.A. 499, J.A. 752. After R.H.'s escape, Defendant still tried to control her by sending her threatening text messages and posting sexually explicit images of her online, which Dr. Cooper specifically discussed as a lasting means of control. J.A. 683–684, J.A. 754, J.A. 952–953. Finally, while it is true that at the time of Defendant's arrest, J.R. was attending community college and still affiliating with him, Defendant's brief ignores that he was taking her financial aid, thus still profiting from her labor. Brief at 49; J.A. 620, J.A. 782–83.

Defendant claims "no 'branding' occurred in this case," because the only tattoo discussed was the result of "a common experience for young women interested in body art." Brief at 48. In fact, B.H. testified at trial that her tattoo was an infinity sign with Wallace's initials inside, which he made her get. J.A. 382–383.

Defendant claims the only evidence that is "even remotely similar" to Dr. Cooper's descriptions of how traffickers train victims to be distrustful and deceptive with law enforcement is that Defendant counseled each victim to ask any potential clients if they were law enforcement. Brief at 50–51; J.A. 950. This minimizes how important this law enforcement-evading effort was to the operation: indeed, each victim and Defendant himself spoke about this requirement with near-verbatim precision. J.A. 343–344, J.A. 471, J.A. 555, J.A. 675, J.A. 1225. And, clearly, the message was received, as J.R. described being dishonest with law enforcement at first because she was still loyal to Defendant and Wallace even after their arrests. J.A. 548.

Finally, Defendant now singles out the government's final questions about the enduring medical impact of being a victim of sex trafficking, arguing this information has "no probative value." Brief at 52. Defendant made no contemporaneous objection to these questions and is on plain error review, which he cannot satisfy. Dr. Cooper explained that lifelong symptoms could include PTSD, depression, and anxiety among others. J.A. 955. In a trial where the jury had just heard from four former victims who were years out from being trafficked by Defendant but still in various phases of their own processing of the events, this description provided important context.

Perhaps the only testimony from Dr. Cooper now objected to by Defendant that actually was not applicable to the facts of this case was the notion of prostitute victims "choosing up" to a new pimp. Brief at 45; J.A. 924. This was discussed as an example of the "particular whole language in pimping that

most people do not know anything about." J.A. 924. Indeed, the fact that none of the victims here ever "chose up" to someone else may further underscore the dominance Defendant cultivated over them. Either way, presenting an example of a neutral vocabulary term unique to trafficking is hardly the type of unfair prejudice contemplated by the rules.

Thankfully, most jurors have never experienced the world of human trafficking. This is an undisputed good, though it also means they do not understand the unique dynamics of that world, its relationships, and its impact. Dr. Sharon Cooper does. As seen above, her testimony was relevant, instructive, and provided important context to aid the jury in their understanding of the evidence. Accordingly, it was certainly not an abuse of discretion for the trial court, like many before, to allow it.

## III. Defendant's within-guidelines sentence was procedurally and substantively reasonable.

### A. Standard of Review.

This Court reviews a district court's sentence for an abuse of discretion, its legal conclusions de novo, and its factual findings for clear error. *United States* v. *Morehouse*, 34 F.3d 381, 387 (4th Cir. 2022).

### B. Discussion of Issue.

A sentence is evaluated for procedural and substantive reasonableness. *United States* v. *Devine*, 40 F. 4th 139, 152–53 (4th Cir. 2022). Defendant claims his within-guidelines sentence had neither, but his claims lack merit.

### 3. Defendant's sentence was procedurally reasonable because the district court acknowledged his arguments but found them unpersuasive.

Procedural reasonableness requires a sentencing court to correctly calculate the guidelines range, consider the statutory sentencing factors in 18 U.S.C. § 3553(a), and adequately explain the chosen sentence. *United States* v. *Devine*, 40 F. 4th 139, 152–53 (4th Cir. 2022). The explanation may be brief. *Rita* v. *United States,* 551 U.S. 338, 356 (2007); *Chavez-Meza* v. *United States*, 138 S. Ct. 1959, 1963–1966 (2018). A district court must address a defendant's non-frivolous arguments for a lower sentence and explain why it has rejected them, but that charge focuses on the "whole of a defendant's argument" and does not require the court to address every specific argument. *United States* v. *Powers*, 40 F. 4th 129, 137 (4th Cir. 2022).

Defendant made limited arguments in mitigation at sentencing. He informed the court there was abuse in his childhood home, which he tried to rise above by going to college and playing football. Brief at 54; J.A. 1385. He also noted that, after serving his state murder sentence, he was trying to do electrical work and taking classes to do so. Brief at 54; J.A. 1385.

These arguments fill two paragraphs of a nearly-1500-page Joint Appendix, and they were specifically addressed and rebutted by the district court. J.A. 1385. First, during argument, the court asked defense counsel *why* his arguments should move the needle on Defendant's sentence, and counsel responded that Defendant had tried to "get away from that kind of life" by going to college. J.A. 1386. The district court immediately noted it was not persuaded

because that argument required going "far back in time." J.A. 1386. Then, in its pronouncement, the court expanded on its position, explicitly rejecting the notion that Defendant should get a downward variance for those reasons because "those events took place when you were in your twenties. All of the events that I'm here to sentence you for today took place after you had served a serious sentence in state prison." J.A. 1397–1398. This also undercuts Defendant's attempt at arguing he was trying to better himself by doing electrical work, as he was doing that while he was committing the crimes in this case.

Defendant's sentence was procedurally reasonable. The district court acknowledged his arguments, considered them, and explained why they were unpersuasive.

### 4. Defendant's within-guidelines sentence is substantively reasonable.

The standard for substantive reasonableness is whether the length of the sentence is "sufficient, but not greater than necessary to comply with" certain basic statutory objectives, including the need for "just punishment, deterrence, protection of the public, and rehabilitation" in 18 U.S.C. § 3553(a). *Holguin-Hernandez* v. *United States*, 140 S. Ct. 762, 765–766 (2020) (cleaned up); *Devine*, 40 F.4th at 152–53. A sentence within or below a properly calculated guidelines range is presumptively reasonable.[7] *Devine*, 40 F.4th at 153. A sentencing court

---

[7]  It does not make a substantive difference here that the sentences were imposed consecutively, rather than concurrently. The guidelines specifically contemplate consecutive sentences "to the extent necessary to achieve the

must balance the statutory factors, but it does not have to give every factor equal weight; it may properly conclude that the gravity of the defendant's crimes outweighs the mitigating circumstances. *See United States* v. *Fowler*, 948 F.3d 663, 672 (4th Cir. 2020).

Defendant's sentence carries a presumption of reasonableness that he cannot overcome. The guidelines themselves counsel that it will be a "rare instance[]" when a defendant earns a total offense level greater than 43. J.A. 1472, ¶ 112. Nevertheless, Defendant "blew the top off the guidelines." J.A. 1393. His guidelines range of life came about after his total offense level was adjusted down *nine* levels from his earned level of 51. J.A. 1472, ¶¶ 110, 112.

Defendant's sentence is easily justified by the factors the district court properly considered in reaching it. As to his offense conduct, the court struggled "to capture how horrific the behavior was," observing it "really is a form of modern-day [] slavery," characterized by "horrific criminal behavior to control all aspects of [victims'] lives, to force them to engage in anal intercourse and other forms of sexual conduct they didn't want to engage in, to be beaten, to be threatened, to be intimidated." J.A. 1396.

As to his history and characteristics, the court told Defendant that "[v]iolence has been a part of your life for your whole life," and noted the sex trafficking conduct happened after he had "had gotten out of prison recently"

---

total punishment." U.S.S.G. § 5G1.2, n. 1. Here, the district court was clearly trying to effectuate a true *life* sentence as the total punishment, as advised by the guidelines range.

for a second-degree murder conviction. J.A. 1395, J.A. 1397. As discussed above, this spoke louder than Defendant's self-improvement attempts from over twenty years earlier. J.A. 1397–1398. Going to college, playing football, and learning some electrical skills were insufficient to overcome that Defendant "has absolutely no conscience, and … derived pleasure from imposing pain on these women." J.A. 1398.

Moreover, Defendant's case—and, therefore, sentence—is easily and importantly distinguishable from his co-defendant's. First, Wallace pled guilty, accepted responsibility, and cooperated, including testifying against his uncle; Defendant, even after confessing to his crimes, never accepted responsibility. J.A. 703–705. Further, Wallace had no felony history; Defendant had recently been released from serving a murder sentence. *Compare* J.A. 1435 ("Antoine does not have any prior felony convictions") *with* J.A. 1464, ¶ 32 (describing Defendant's murder conviction). Finally, though Wallace may have started the criminal activity, the district court found as a matter of fact that "Jenkins essentially taught Wallace the prostitution business," including directing him, teaching him how to find and exploit victims and recruit others and generally exercising control over others. J.A. 1375–1376. Given the voluminous trial record supporting these findings, this cannot be found to be clearly erroneous.

For all these reasons, the district court observed "protecting the public is absolutely critical in this case," and committed to imposing a sentence which would do that, as well as deterring others, promoting respect for the law, and incapacitating the Defendant. J.A. 1398. To do so, he imposed a guidelines

sentence, which, given the extraordinary circumstances of this case, was certainly substantively reasonable.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully submits that the jury conviction and judgment of the district court should be affirmed.

Respectfully submitted, this 20th day of December, 2022.

MICHAEL F. EASLEY, JR.
*United States Attorney*


BY:    */s/ Lucy Partain Brown*
LUCY PARTAIN BROWN
*Assistant United States Attorney*
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
Telephone: 919-856-4530

DAVID A. BRAGDON
*Assistant United States Attorney*

*Of Counsel*

## CERTIFICATE OF COMPLIANCE

1.    Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, I hereby certify that this brief meets the page or type-volume limits of Rule 32(a) because, exclusive of the portions of the document exempted by Rule 32(f), this brief contains:

      ☐  _____  Pages *(may not exceed 30 pages for a principal brief or 15 pages for reply brief, pursuant to Rule 32(a)(7)(A))*; or

      ☒  12,613  Words *(may not exceed 13,000 words for a principal brief or 6,500 words for reply brief, pursuant to Rule 32(a)(7)(B)).*

2.    Further, this document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in Microsoft Word 2016 using fourteen-point *Calisto MT*, a proportional-width typeface.

/s/ *Lucy Partain Brown*
LUCY PARTAIN BROWN
*Assistant United States Attorney*